The COMMONWEALTH *against* CHRISTIAN FISHER. The same *against* PETER RICHTER. The same *against* FREDERICK KREAMER, and the same *against* LEWIS DEWART.

An application by the owners of property, under the act of 9th April, 1827, for damages done by the location and construction of the Pennsylvania canal is premature, if made after the completion of the canal upon the land of the petitioner, and before the completion of that division of the canal upon which such lands are located.

The right of the State to take and use for public purposes, six out of every hundred acres of land sold, is not an implied right but an express reservation: the State infringes upon no private interest, nor does it injure any man, by using this right; the utmost that can be required is, that it should pay for improvements put by the owner on such part as the State should subsequently use.

When an act of assembly requires *reasonable* notice to be given by one party to the other, ten days, generally, would be sufficient.

The acts of the 25th February, 1826, and 9th April, 1827, on this subject, are to be construed in connection with each other, and by such construction it is necessary that the viewers appointed to assess, the damage done to the land of an individual, should, in their report, state the courses, distances and quantity, with such references as will designate the exact property converted to the use of the State.

When the approval of a Court of Quarter Sessions is required by an act of Assembly, to an assessment of damages, that court will not readily set aside a report, on the ground that the damages are excessive, yet it may become their duty so to do. It would be a much stronger case which would authorise the Supreme Court to set aside a report on that ground.

All below high water-mark in the channel of the Susquehanna river, is a public highway, and the State has a right to improve it by deepening it, or it may raise dams in it, and thus swell the water; and if in so doing, a spring, which rises below high water-mark is covered, and which an individual has been accustomed to use, he cannot recover damages therefor, under the act of 9th April, 1827, it is *damnum absque injuria.*

The sixth section of the act of the 10th April, 1826, gave authority to the commissioners, to take releases to the commonwealth from individuals, through whose lands the canal might be thereafter located.

The consideration of such releases, so taken, has not failed, because the eastern and western waters have not been united by that route of the canal along which the releasors live. The consideration is, that the canal shall pass through the land of the releasor.

In each of these cases a *certiorari* was issued, at the instance of the commonwealth, to the Court of Quarter Sessions of Union county, to remove the proceedings which had been instituted by the defendants severally, to recover damages for injury done to their property, by reason of the construction of the Pennsylvania canal.

The same exceptions which were filed in the court below to the confirmation of the several reports, and there overruled, were relied upon here.

1st. The application was not authorised by law, having been made before the completion of the canal.

(The Commonwealth *v.* Christian Fisher and others.)

2d.　The work on the several sections stated in the petition, was not completed when the application was made; nor had the said sections been taken off the hands of the contractors by the canal commissioners.　The contracts for making fence on said sections had not been complied with.

3d.　Reasonable notice of the time and place of meeting of the viewers, was not given to the nearest acting canal commissioner.

4th.　The viewers did not ascertain the quantity, or describe the boundaries, of the land by them valued; nor the quality, nor duration of the estate and interest of the applicant to the same, agreeably to the act of assembly.

5th.　The damages are exorbitant, and were assigned without any evidence produced before the viewers.

There was added in *Richter's* case, an exception to the allowance of damages for injury done to a spring, by the backing of the water of the creek upon it.

And in *Dewart's* case, there was this additional exception, "that he had executed a release to the commonwealth of all damage, previously to his application."

*Lashells,* for the commonwealth.

*Donnel* and *Greenough,* with whom was *Sterrett,* for the claimants.

A statement of the whole case, of the several acts of assembly in relation to it, and the positions taken on the one side and the other, are contained very fully in the opinion of the court, which was delivered by

Huston, J.—If the first exception is sustainable, it will be unnecessary to consider the second.　By the act of the 25th February, 1826, the canal commissioners were authorised to locate, and contract for making a canal, locks and other works necessary thereto, from the river Swatara, at or near Middletown, to or near to a point on the east side of the Susquehanna opposite the mouth of Juniata; and another portion from Pittsburg to Kiskiminitas. This act is entitled, an act to commence a canal, to be constructed at the expense of the State, to be styled "The Pennsylvania Canal." On the 9th April, 1827, was passed, an act to provide for *the further extension of the Pennsylvania canal.* The first section provides for extending one part, from the eastern section up the Juniata to Lewistown: another up Kiskiminitas and Conemaugh, from the western section of the Pennsylvania canal to Blairsville: and also, a canal, locks and other works necessary thereto, up the valley of the Susquehanna, from the said eastern section of the Pennsylvania canal, to a point at or near Northumberland; to be selected with due regard to the accommodation of the trade of both branches of the river.　It is on this last, the lands for which damages are claimed, are situate.　It was asking a great deal from this court, when we were required to believe, that from Middletown to Juniata,

made the year before, was not here called the eastern section; and that it was impossible to ascertain from the law, that it included all that part of the Pennsylvania canal between the mouth of Juniata and Northumberland.

The 8th section provides, "that if any person shall consider himself aggrieved by reason of the canal passing through lands of which he is the owner, or by interfering in any manner with his rights of property, he may at the completion of the work thereupon, or within one year thereafter, petition the Court of Quarter Sessions of the county in which the damage has been committed, and the said court shall thereupon appoint five reputable citizens within the judicial district, of which the said county is a part, and not residing in said county, &c."

It was contended on one side that the phrase, "completion of the work thereupon," meant the completion of the work on that part of the canal which run through the land of the petitioner; and on the other, that it meant the completion of the work on the canal from the eastern section to Northumberland; and we are of opinion, that both the literal meaning of the words, and the whole spirit and scope of the act, require this latter construction. The viewers are to view the premises, and taking into consideration the advantages of said canal to the petitioner, report such damages, if any, as they or any three of them shall think the owner has sustained by reason of said canal; and in case the said viewers are of opinion, the said petitioner has received no damage, or that the advantages derived from the canal are a sufficient compensation to the petitioner for any injury sustained by him, they will also report the same to the said court, &c. Now it is utterly impossible that there can be any advantage from an unfinished canal; it must be completed and the water in it, before any advantage to the community or to an individual can be derived from it. This construction has, we believe, been put upon this law by every tribunal before whom it has come, except the court of Union county.

But the petitioners have endeavored to raise a great question: that the State could not take their lands without compensation: and that compensation must be in money, and must be paid instantly; nay, it was even intimated that the damages ought to have been paid before any damage was done.

Although the petitioners and their counsel have most carefully forgotten certain facts, this court is bound to remember them, if they form a part and an essential and prominent part of the law of the land. From the first settlement of this country, both under the proprietors and the State, the invariable usage and law was, in the sale of vacant land to any applicant, to add six acres for every hundred, for roads, &c. These six acres were never paid for by the applicant: they were not any particular and specific or designated six acres, but they were thrown in, that whenever the

(The Commonwealth *v.* Christian Fisher and others.)

commonwealth thought a public road necessary, through any part of the State, it might make it without interfering with the private right of any individual. The right of the State to take six acres out of every hundred acres sold, is not an implied right, but an express reservation. It infringes no private right, nor does it injure any man by using this right. The very utmost which can be required is, that it should pay for improvements put by the owner on the part afterwards used by the State.

When the State authorized private corporations to make turnpike roads or canals, it compelled them to pay for the land occupied by such road or canal: ' for such corporation was very different from the State; its rights were very different; no reservations had been made for its use, no contract for its benefit. But when the State itself undertook to make public canals, its right was unquestionable. These petitioners, then, ought to be grateful for a bounty given them by the State; to be thankful rather than presumptuous; to acknowledge kindness rather than to assume the attitude of injured persons.　If this were not so, if the State had no right to the six acres in every hundred, and was bound, in the strictest manner, to pay for the part appropriated for general and public use, until the canal is completed, it cannot be known how much will be required, nor whether in addition to the part actually occupied, injury will or will not be done to the adjacent lands, nor whether great value may or may not be added to the residue of the farm.

There was a time and there is a case, when some, in their overweening fondness of new and undefined power, spoke of a great State, and the government of a nation, as lightly as of the acts and authorities, and responsibilities of a petty corporation; of the power to make laws for the general welfare, and binding the whole community, as no greater in degree than the resolves of a petty borough. It was forgotten that the latter was restricted by legislative enactment, and the former was the enacting power, with authority unlimited, except in a few particulars, and not answerable for its acts, except to those from whom it received its power, the people. What the government conceives is for the public good it may do; what that public good requires, it may claim, and how compensation is to be made, how it is to be ascertained, and when to be made, must, from the very nature of things, be directed by that very government itself. It may seem pretty to talk of regulating all this by five men, or a Court of Quarter Sessions; but although pretty to talk about, and pleasant to imagine, and profitable too to some, it is not to be carried farther than a little talk and discussion. If ever it shall happen that any actual injury or injustice is done to any citizen, and his case is brought before this court, he will receive redress to the extent of our power. There is nothing like that here: the whole proceeding

(The Commonwealth v. Christian Fisher and others.)

is calculated to prevent the possibility of injury to the citizen *in theory;* and *in practice,* has resulted in injustice to the community. The best thing which could happen to a man was, that he could have some pretext for putting his hand into the treasury; if he is delayed, by having proceeded irregularly, too soon, or illegally, an outcry is raised as though the country was invaded.

Questions on constitutional law are sometimes grave and important, but such occur seldom. Occasion, however, is often taken to discuss them, as applicable to matters on which they have no bearing, which are in themselves among the ordinary subjects of legislation: in fact it is a standing topic, always dragged in where there is nothing else to be said; and, certainly, in this State, it is a ludicrous rather than a serious objection to any measure; I mean as it is commonly applied.

The third objection is to the notice to the canal commissioners. The act requires reasonable notice; ten days, generally, would be reasonable notice; but if several petitioners would hold views on the same day, no notice would be reasonable; so, if given to attend when from particular occurrences it was well known that the canal commissioners could not attend.

The fourth exception is important, and the proceedings are in this particular totally defective. The act of 25th February, 1826, directed the damages to be ascertained by an inquisition, who were directed to ascertain also and describe the bounds of the land by them valued, and the quality and duration of the interest and estate in the same required by the board of canal commissioners for the use of the State; and it provides, that on payment therefor, the State shall be seized of such lands as of an absolute estate in perpetuity, or of such less quantity and duration of interest or estate in the same, or subject to such partial or temporary appropriation, use or occupation, as shall be required and described as aforesaid, as if conveyed by the owner or owners. And as acts on the same subject are to be construed in connexion, the only alteration introduced by the 8th section of the act of 9th April, 1827, as to this particular is, that the five reputable citizens are substituted for the inquest. The State is still to pay for the land, and it is still requisite that it should appear of record what she has paid for, and to what she is entitled. The report must state the courses and distances, and quantity, with such references as will designate the exact property converted to the use of the State. The title which the applicant has for the land must also be always stated. To apply for damages for injury done by sections thirty-nine and forty, or part of forty, is no description; no record is or will be kept of such sections; where each began and ended was once marked by a small stake driven into the ground, as a direction to the labourer, but these are not now to be found, or soon will disappear.

That the damages are exhorbitant is another exception. There

(The Commonwealth *v.* Christian Fisher and others.)

is no specific evidence before this court on this subject, except that lands are valued at above one hundred and twenty dollars per acre, when we know they sell at much less than one half that price. The report is to be *approved* by the court: this implies consideration and judgment; and although a court would not readily interfere on this account, yet it may become their duty so to do. It would be a still stronger case which would justify this court to set aside proceedings on this ground; but I will not say we would not be compelled by a sense of duty so to do in some cases. I am afraid the viewers have been induced, somehow or other, to put a wrong construction on the act of assembly: they are bound to take into view the advantages of the canal to the petitioner; now if he values his whole tract of land five or ten dollars per acre more than he estimated it to be worth before the canal was made, this is the value of the canal to him; and it is inconceivable how an honest man can, on his oath, say a person has sustained damage by a canal which has increased the value of his estate five or fifteen hundred dollars.

As to *Richter's* spring, I do not know that we have facts enough before us, from which to form a satisfactory opinion. This much however, may be said: all within the channel of the river is a public highway, except the islands. The State, for the purpose of improving the natural channel, or making an artificial one, may make it deeper in some parts, and drain or make shallow other parts; or it may raise dams partially or entirely across the river, and thus swell the water, and this may constanly or occasionally cover a spring rising below high water mark; or may deepen the water at the out-let of a spring above high water mark, and thus occasion it to be covered oftener with back water; all this it may do, and he who used the water of that spring must submit to it as an evil, incident like many other evils, as well as advantages, to a *situation on the bank of a large navigable stream.* It is no uncommon thing to find springs between low and high water mark, along the Susquehanna, and such are often a matter of convenience at some seasons of the year, to those who live near; but the State never sold any land below high water mark, and it is ridiculous to talk gravely of a great national work being obstructed, because a man will be deprived of the use of what was never his own.

The additional exception in the case of *Lewis Dewart,* remains to be considered: " that he had executed a release to the commonwealth, previously to the date of his petition for the appointment of viewers." That release was in these words:

" Know all men by these presents, That we, the subscribers, for and in consideration of the benefit to be derived to us from the Pennsylvania canal passing through our land, or in the neighbourhood thereof, have agreed, and hereby do agree with the

(The Commonwealth *v.* Christian Fisher and others.)

commonwealth of Pennsylvania, each for himself, his heirs and assigns, that the said commonwealth's commissioners, engineers, superintendents, workmen, or others employed by or under the authority of the commonwealth, may freely, and without charge, enter upon, occupy, use and keep so much of our land as may be deemed necessary for a canal, and for the basins, locks, towing-paths, embankments and other devices whatever, which may be necessary therefor, and such portion of land on each side, not exceeding in width fifty feet, as may be required or thought convenient; and may freely and without charge, enter upon any part of our land, and take therefrom, for the use of the commonwealth, all such stone, earth, or other materials whatever, excepting timber, as may be found needful or useful in the construction of the said canal and works; and we do hereby remise, release, and forever quit claim to the commonwealth, all, and all manner of claim or demand for damages or compensation for land so taken or occupied; for stone, earth, or other materials, excepting timber, taken or used; and for all and every injury that may be sustained, by reason or in consequence of such occupation and taking, or of entering upon and taking materials, or of excavating our land for obtaining the same, or otherwise howsoever."

The counsel for Mr. *Dewart* insisted, that the commissioners had no power to take a release. This must have been insisted on before reading the 6th section of the act of the 10th April, 1826, which expressly directs the commissioners to call upon, or direct to be called on, and receive from all and every person or persons, as far as conveniently can be done, who are the owners of land along or near the several proposed lines of communication between the eastern and western waters, acquittances or releases from any claim to damages, in case the said line of communication shall pass through their land, or for materials which may be taken to carry on the work. The principal objection, however, was founded on the assumption of the fact, that the release was signed under the idea that a water communication could be made the whole distance to Lake Erie, and that communication would be through the lands of the signers, and by the way of the west branch of the Susquehanna.

It may be admitted that some persons on the Juniata, once said a communication by water could be made on that route; that some persons on the west branch said there could be a connected water communication by that route, and that each was believed by those who knew nothing of the route, and had never crossed the Alleghany mountains; but it is not admitted that any man of sense, who knew the country, and who was not blinded by his interest, ever said so, or thought it practicable; nor did any engineer. Nor is it true that our acts of assembly sanction the idea that one canal,

(The Commonwealth *v.* Christian Fisher and others.)

and only one, was to be made; or that if a canal could not be made the whole distance, none was to be undertaken. The first law, of 11th April, 1825, directs examinations to be made from Philadelphia to Pittsburg, by the way of the west branch—by the way of Juniata, and from Pittsburg to Lake Erie; one other from Philadelphia to the northern boundary of the State towards Seneca or Cayuga lakes; one other through Cumberland and Franklin counties to the Potomac; one other to the Potomac by Conewago, and one to connect the proposed Chesapeake and Ohio canal with the Juniata route.

Under this act, *Mitchell, Geddis,* and others, had examined the head waters of the Susquehanna, and there remained no doubt on the subject; it was certain no continued water communication could be made. But a clamour was raised by those on the west branch, of whom such conduct might have been expected, and some of whom it ought not to have been expected, which drove from the State one of the best engineers ever in her employ, and a man of as much honour as capacity : I mean *James Geddis.* On the 25th February, 1826, we find the next act. The people on the Juniata had sense and honesty enough, to have by this time admitted there must be a portage on that route : some few on the west branch still clamoured about an entire water communication, and insisted loudly, that if a portage was necessary, it would be easier and shorter by that route : but I deny that, at that time, one man of sense in the State, believed in the practicability of a water communication, connecting the eastern and western waters. The preamble to that law has been relied on, " Whereas the construction of a canal for the purpose of connecting the eastern and western waters, is believed to be practicable," &c. not a canal connecting, but "for *the purpose of connecting* :" and it directs the part from Middletown to the Juniata, and from Pittsburg to Kiskiminitas to be begun.

The next act on this subject is that of the 10th April, 1826, the sixth section of which I have before recited, and which authorises the taking of releases. Every man in the legislature, and every well informed man in the State, at that time, knew that it was contemplated to go to Pittsburg, by the Juniata route; and also to go up the Susquehanna, and up both branches of it, the first to facilitate the trade with the western States, and the latter for the benefit of our own citizens. Although the work on both branches is now partially suspended, it is only suspended. In all countries, in all ages, those who have improved the navigation of their country, or constructed canals, have been considered the benefactors of their country, and their policy the wisest and the best. Clamour and sectional feeling, and narrow local policy may interrupt the improvement of the State, and have interrupted it, but the counsel and the court have spoken without authority when they say it is

(The Commonwealth *v.* Christian Fisher and others.)

abandoned.    I am not sure it was not wise to suspend it until what
was began should be completed.

There is nothing more unsafe than to throw away the release
itself, its plain and obvious meaning, and to look for its construction
in preambles to acts of assembly, or judge of it from party squab-
bles.    It is made "in consideration of the benefit to be derived from
the Pennsylvania canal passing through our lands," not one word
about eastern or western waters, nor allusion to them, or the con-
necting them by continued water communication, or portage by
land; nor a word about the north eastern branch of the Susquehan-
na.    The Pennsylvania canal does pass through the lands of the
petitioner, and is in progress up each branch of the Susquehanna,
his release therefore takes effect.

It is obvious the petitioner assumes positions somewhat inconsis-
tent with each other; first, he says he must be paid before the whole
canal is completed; nay, before that section is completed which
passes through his lands; and next he says, his release is not to bind
him, because the canal is not completed, and no appropriation for
putting any more of it under contract this year; in every way he
asks to gain.

We are of opinion that this release is too plain to admit of doubt,
and forever estops the applicant from demanding from the State,
what has solemnly been released to it.    But it is said, that he did
not own all the lands, for which the viewers have given damages,
at the time he executed the release.    The record, however, ex-
hibits nothing on this subject: it is true his counsel have offered to
us a deed for part of the lands, dated in 1827, a year after the
release.    This is not regularly before us, nor, if it 'was, is it quite
conclusive that he did not own the land *in fact*, a year before he
got his deed.    Something has also been said about his owning
another tract in the neighbourhood, which he gave in exchange
for this: how far, or whether in any way, a man who has released
can get clear of the effect thereof by exchanges of property, is not
before us; and we say nothing of its effect.    Some of the land he
owned when the release was executed; it is all valued together.
The objections to the proceedings in the other cases, particularly
the defect of designation in the report of viewers, apply to this.

Proceedings in all the cases reversed.