JOHN KOOPMAN v. DELOS A. BLODGETT ET AL.

*Waters and water-courses—Navigable streams—Right of floatage— Riparian rights—Equity—Injunction.*

1. In this case it is held that complainant is entitled to a decree restraining defendants from retaining the water in Clam river to such an extent as to prevent complainant's mill from getting constantly the *natural* volume of the stream, and from letting out floods which will injure the complainant's dam. It is not considered necessary or possible to define in advance just how much water should pass, but it is suggested that practically there can be no great difficulty in obeying the injunction granted, and that the parties, as reasonable men, can no doubt agree upon such measures as will make it unnecessary to interfere hereafter.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—In holding that a public right of floatage exists in streams capable of furnishing valuable facilities for moving logs cut in the vicinity, it has never been the understanding that the public had any other rights than were furnished by the *natural* waterway. The riparian owners have a right to the enjoyment of the natural flow of the stream with no burden or hindrance imposed by *artificial* means. No easement beyond the natural one can be obtained without authority, and no further publ.c facility can be exacted without some dedication or condemnation.

*b*—No law exists in this State for the condemnation of property for mere purposes of floatage; and as the experience of many years has shown that log driving is usually conducted by private persons or companies, who for the time control the entire business on the smaller streams, so that single owners of limited amounts can do very little by themselves, the *public* character of such facilities is not very obvious.

*c*—In the case of public streams *actually* navigable, the right of floatage and navigation may be general. But the rule which makes private streams subservient to floatage is one which has been based on their *natural* surroundings, and rests on convenience, if not necessity. It is not competent to treat them as public highways for floatage from all quarters. One of the greatest abuses practiced in our water-ways is that animadverted on in *Booming Co. v. Jarvis*, 30 Mich. 308, of crowding them beyond their capacity. It is not competent to subject a small private stream to burdens from distant localities.

*d*—A person owning a suitable place for a mill-site cannot be deprived of it because some one else has wrongfully interfered with the stream above him.

*e*—Without either such a lapse of time as will bar suit or indicate acquiescence, or some act of estoppel, rights of property are not to be barred.

*f*—The straightening by the owner of a mill, at the expense of parties driving logs down such a stream, of the channel just above the mill, which change made the channel safer for his own premises during log running, as well as more convenient for log driving, while indicating that he did not deny that logs might be run down the stream from above, in no way authorized its use in such a way as to crowd it beyond its fair capacity, or to take such action as involved danger to the mill.

*g*—It has always been settled that the owner of realty is entitled to the aid of equity to prevent permanent and continually recurring injuries to the enjoyment of his property. To deprive him of such enjoyment is to deprive him of the property itself, wholly or to the extent of the mischief; nor can wrong-doers rely upon their own wrong to change or lessen his means of redress.

Appeal from Missaukee. (Fallass, J.) Argued May 8 and 9, 1888. Decided June 15, 1888.

Bill to restrain the obstruction of the flow of water in Clam river. Complainant appeals. Decree reversed, and one entered as stated in head-note 1. The facts are stated in the opinion.

*More & Wilson* (*M. Brown*, of counsel), for complainant, contended:

1. Riparian proprietors upon both navigable and unnavigable streams are entitled, in the absence of grant, license, or prescription limiting their rights, to have the stream which washes their lands flow as it is wont by nature, without material diminution or alteration; citing Gould, Waters, § 204, and cases cited; *Middleton v. Booming Co.*, 27 Mich. 533; *Dumont v. Kellogg*, 29 Id. 420; *Booming Co. v. Speechly*, 31 Id. 336; *Booming Co. v. Nelson*, 45 Id. 578; *Woodin v. Wentworth*, 57 Id. 278; *Anderson v. Boom Co.*, 61 Id. 489; *Witheral v. Booming Co.*, 68 Id. 48.

*Edwin F. Uhl*, for defendants, contended:

1. It is settled by repeated adjudications in this and the courts of other states—

    *a*—That the use of dams upon floatable streams is lawful and proper.

    *b*—That equity will not interfere by injunction to prohibit the exercise of that lawful right.

    *c*—That both mill-owners, and those interested in public floatage, have rights in the stream, neither right being paramount to the other, and each right modifying the other; citing *Buchanan v. Log-running Co.*, 48 Mich. 364; *Herman v. Mfg. Co.*, 1 Fed. Rep. 145; *Miller v. Sherry*, 65 Wis. 129; *Coldwell v. Sanderson*, 69 Id. 52; *Pound v. Turck*, 95 U. S. 462; *Field v. Log-driving Co.*, 67 Wis. 569; *Hall v. Boom Co.*, 51 Mich. 377; *Kroll v. Nester*, 52 Id. 70; *Anderson v. Boom Co.*, 61 Id. 489; *Bauman v. Boom Co.*, 66 Id. 544; *Olson v. Merrill*, 42 Wis. 203.

2. The legislation of the State has expressly recognized the driving of streams by the use of dams as lawful, and abolished all distinction as to liability on account of obstructive logs in the rear, by means of water running naturally in the stream, and by means of floatage created by dams in the stream; citing Act No. 66, Laws of 1887.

3. Defendants have the right to pond so much water as may be necessary by its accumulation to enable them to prosecute their business, and for the abuse of this right are liable to the party injured in an action for damages, and the manner in which the stream shall be used cannot be regulated by injunction; citing *Dumont v. Kellogg*, 29 Mich. 420; *Mfg. Co. v. Mfg. Co.*, 39 Conn. 576, 583; *Gould v. Duck Co.*, 13 Gray, 448; *Drake v. Woolen Co.*, 99 Mass. 574; *Pitts v. Lancaster Mills*, 13 Metc. 156; *Thurber v. Martin*, 2 Gray, 394; *Hooy v. Sterrett*, 2 Watts, 331, 332; *Hetrich v. Deachler*, 6 Penn. St. 32; *Hartzall v. Sill*, 12 Id. 248; *Whaler v. Ahl*, 29 Id. 98; *Roller Mills v. Wright*, 30 Minn. 249.

CAMPBELL, J.  Complainant is owner of a mill and water-power on Clam river in Missaukee county, at Falmouth, about 12 miles from the place where that river discharges into the Muskegon river.  Defendants Blodgett and defendant Pion, who is their foreman, are complained of for maintaining and managing several dams further up the stream, used for no other purpose than to facilitate the moving of logs in the stream by storing up and letting out water to float the logs and to aid in driving them.  The effect on complainant's mill is claimed to be an interference with and in some cases a stoppage of the water supply, and a danger, which has proved an actual one, that a sudden escape of the water from the dams may destroy complainant's dam and mill entirely.

The testimony shows very clearly that interruption of the water supply is, and has been, very serious, to the extent of greatly damaging the mill and business, and that the whole dam and mill property were on one occasion destroyed by the rush of water.  It also appears that the difficulty is not one occurring temporarily and at rare intervals, but frequently and for considerable periods at different times in the year.  There is very little pretense that defendants have not made themselves responsible for damages by the manner in which their work has been carried on, although they dispute the extent and character of the wrong done.  But their defense rests chiefly on their right to do so much of what they have

done as to leave the case in the predicament of a contest between parties who have similar and common rights, which must accommodate each other, and any occasional abuse of which should be compensated in damages, and not restrained by measures in equity.

These rights claimed by defendants are alleged by them to spring from the character of Clam river as a floatable stream, in which they insist on a right to run logs by means of the contrivances resorted to, so that complainant is, as they insist, required to put up with the incidental inconveniences.    The case presents a rather remarkable instance of the way in which a small stream has been by various additions and appliances made to perform the work of a large one, and made subservient to a single set of interests, at the expense of all others.

Clam river has its head in Clam lake, which is by the bendings of the stream apparently between 30 and 40 miles above Falmouth.    By some work done by defendants, or some of them, it has been enlarged in its volume of water to some extent by tapping that lake so as to draw down its level. Originally the testimony shows that the upper waters of Clam river were not available in their natural condition for floatage.    Some of the witnesses describe the water as running for a distance under ground, and then emerging.    The explanation given by defendants seems to indicate that, by what may have been originally a gathering of rubbish, a surface was finally made, which was solid, and bore trees upon it, thus forming a soil higher than the stream, which worked its way, though probably not in any defined course, under it.    There were also more or less shoals and obstructions along the stream. Defendants, and perhaps others, cleared out most of the rubbish, and improved the stream so as to make it flow in a continuous channel from its upper waters to its mouth.    At various times dams were built across the river for purposes auxiliary to log floatage, of which those which chiefly figure

in the record were these:  A reservoir dam was built near the head of the river of considerable height, which was meant to keep a supply of water on hand to use when the stream was low, and retained at times for periods of some months so as to allow no escape, unless, possibly, when the dam was more than full, so as to run over, which was not often.  Not far from half a dozen miles above Falmouth was a high dam, which threw back the water over a large region of rather low land, and made a very large pond or accumulation.  This was also very generally stored up for emergencies in the running of logs, but used for floods and similar purposes as often as needed.  Some smaller dams seem to have been used less for storage than for floating or flooding, both for getting the logs afloat so as to start them down, and for supplying water to carry them over the shallows.  The high dam last referred to is complained of both as unreasonably stopping the flow of water to the mill, and as creating danger by its floods to the dam and mill of complainant.

There is also above Falmouth a small feeder, known as "Mosquito Creek," which naturally is an insignificant stream, but into which water was drawn illegally from a neighboring lake known as "Muskrat Lake," so as to enlarge the volume of Clam river from that source.

Defendants appear to have practical control over the log driving on Clam river above Falmouth, as well as to a large extent below, and complainant claims that without the appliances which defendants use the log-driving business could not be carried on to any large extent, while with them the quantity is very great.  It becomes important to know what is the character of this stream as a natural floatway for logs.

Upon this there is some dispute, but not very much.  The witnesses who testify concerning the capacity of the stream in its natural condition differ somewhat as to what is its natural condition.  The only part of the river which it becomes important to consider in this case is the part of it above Fal-

mouth.　Much of the testimony as to floatage capacity before the upper dams were built refers to the lower part of the stream.　The utmost that can be said of the upper stream is that for a short time during high water there was some capacity for taking down logs.　But the testimony can hardly be said to leave any doubt that, without the aid afforded by dams and the other expedients used, the floatage would be very. limited, and practically of small account.　Even the dams, without the addition to the stream of more or less water borrowed from the lakes referred to, would not enable the logs to be floated down in anything like the large amounts now moved.　No one can read this record without being convinced that for all practical purposes the river as used is to a great extent an artificial water-way, owing most of its value to the improvements.　It would be entirely proper to consider the mere removal of rubbish and cleaning out the stream of what has been allowed to incumber it as no change in its character.　But there is no rule of law which will allow those who rely on mere floatage rights to add to the burdens laid on riparian proprietors by such an easement.　In holding that a public right of floatage exists in streams capable of furnishing valuable facilities for moving logs cut in the vicinity, it has never been the understanding that the public had any other rights than were furnished by the natural water-way. The riparian owners have a right to the enjoyment of the natural flow of the stream with no burden or hindrance imposed by artificial means.　No easement beyond the natural one can be obtained without authority, and no further public facility can be exacted without some dedication or condemnation.　No law exists in this State for the condemnation of property for mere purposes of floatage; and as the experience of many years has shown that log driving is usually conducted by private persons or companies, who for the time control the entire business on the smaller streams, so that single owners of limited amounts can do very little by them-

selves, the public character of such facilities is not very obvious. It is very clear, from the testimony in the present case, that no one could make much use of the floatage capacity of Clam river except by depending on defendants' dams, which are not only important aids to floatage, but insuperable obstacles to anything done without the co-operation of their owners.

It appears also that, in connection with these artificial aids to floatage, this small stream has been made a receptacle and channel for enormous quantities of logs not cut upon or near its banks, or those of streams furnishing access to it, but brought by rail from considerable distances, and forming no part of its natural burdens. In the case of public streams actually navigable, the right of floatage and navigation may be general. But the rule which makes private streams subservient to floatage is one which has been based on their natural surroundings, and rests on convenience, if not necessity. It is not competent to treat them as public highways for floatage from all quarters. One of the greatest abuses practiced in our water-ways is that animadverted on in *Grand Rapids Booming Co. v. Jarvis*, 30 Mich. 308, of crowding them beyond their capacity. It is not competent to subject a small private stream to burdens from distant localities. Any rule which would justify what has been done in the use of Clam river would go very far towards authorizing water to be turned into any convenient ravine, and converting that into a log stream against the will of the owner.

One of the most important effects of the works on Clam river is that logs may be and are driven for longer periods, and at different seasons, than customary in natural streams, and the consequent extension of the interference with riparian rights.

The testimony is clear that complainant's mill cannot be safely operated while logs are running. There are some witnesses who claim that it might have been so built as to let

logs go through the dam at the same time that water passed
through the flume to the wheel.  But no reliance can be
placed on this testimony.  It is not only manifestly biased,
but based on no experimental knowledge.   It is beyond
question that, when logs are run in the manner and to the
extent shown here, the log chute as actually existing is no
more than adequate, and has not always been effectual to pro-
tect the dam from washing.

It is also claimed that complainant recognized in various
ways the usages of the river in log floatage, and built his
mill at his peril.  This is true to some extent, but not to the
extent claimed.  There is no pretense that he encouraged any
of the outlays of defendants, or that they relied on his
acquiescence.  A person owning a suitable place for a mill-
site cannot be deprived of it because some one else'has wrong-
fully interfered with the stream above him.   Without either
such a lapse of time as will bar suit or indicate acquiescence,
or some act of estoppel, rights of property are not to be
barred.   The only act of any significance is the straightening
of the channel just above complainant's mill, which com-
plainant executed at defendants' expense.   This indicated
what complainant has never disputed, that he did not deny
that logs might be run down the river from above, and the
channel by this change was made safer for complainant's own
premises during log running, as well as more convenient for
log driving.  But this recognition in no way authorized the
use of the river in such a way as to crowd it beyond its fair
capacity, or to take such action as involved danger to the
mill.

In our view the only question before us of any difficulty is
the nature and extent of the remedy.   That defendants have
given frequent occasion for damage suits is obvious.   But it
is equally obvious that such a remedy is inadequate.   It has
always been settled that the owner of realty is entitled to the
aid of equity to prevent permanent and continually recur-

ring injuries to the enjoyment of his property. To deprive him of such enjoyment is to deprive him of the property itself, wholly or to the extent of the mischief. Neither can it be allowable for wrong-doers to rely on their own wrong to change or lessen his means of redress. When they do mischief it is their own fault if they render a stringent remedy necessary, and they, and not the party injured, must take the consequences. If the remedy is difficult, it is made so by their conduct. But at the same time it is desirable to give complainant no further relief than will protect him in his interests. He is not concerned beyond this, and defendants are not responsible to him further.

This will be accomplished by restraining defendants from retaining water to such an extent as to prevent the mill from getting constantly the natural volume of the stream, and from letting out floods which will injure the complainant's dam. We do not think it necessary or possible to define in advance just how much water should pass. Practically there can be no great difficulty in obeying this injunction, and we have no doubt the parties, as reasonable men, can agree upon such measures as will make it unnecessary to interfere hereafter.

The decree below must be reversed, with costs of both courts, and a decree be rendered here in accordance with what is suggested.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred.