WILLIAM S. DE CAMP, Individually and as Trustee, etc., of JULIA
L. DE CAMP, Deceased, Respondent, v. LEMON THOMSON and
Others, Composing the Firm of the MOOSE RIVER LUMBER COM-
PANY, Appellants.*

*Riparian rights — Moose river and Big Safford creek — way of necessity to float logs
— effect of artificial improvements of a stream — continuous capacity, not required
— exercise of the right of eminent domain for a private purpose — reservation of
highways in a patent — chapter 207 of 1851 is unconstitutional.*

A way of necessity for the floating of lumber down a stream is not created, in
favor of one whose title was first acquired from the common source of title, by
reason of the fact that it is cheaper to so transport the logs than to transport
them by a railroad.

The capacity of a stream to float logs to market need not be continuous in order
to make it a public highway for that purpose.

The fact that an abutting owner by an expenditure of money has, for his per-
sonal convenience, caused the stream to become temporarily navigable for a
certain distance, does not give the public any greater right to the use of such
stream than it had before.

The conditions in these respects of the North Branch of the Moose river and of
Big Safford creek considered.

The provision contained in the grant by the State of townships 1 and 7 of
Macomb's patent, which reserves to the State the right to take "five acres out
of every hundred acres of the said tract of land for highways" relates to the
entire tract, and does not contemplate that each acre shall severally be liable
to a reservation for this purpose of five per cent thereof, and in the absence of
any language in an act of the Legislature showing that such was the intent of
the Legislature, it will not be presumed that in declaring, by chapter 207 of the
Laws of 1851, the North Branch of the Moose river a highway for a particular
purpose, without providing for compensation to riparian owners, there was any
exercise of such power reserved in the Macomb patent — certainly not, until it
is made to appear that such power has not already been exhausted.

*Semble,* that an act of the Legislature which declares a stream to be a public
highway for the floating of logs, and does so simply for the convenience of an
individual owner of timber lands in that vicinity, is unconstitutional, being an
exercise of the right of eminent domain for a private purpose.

APPEAL by the defendants, Lemon Thomson and others, from a
judgment of the Supreme Court in favor of the plaintiff, entered
in the office of the clerk of the county of Herkimer on the 29th
day of June, 1896, upon the report of a referee.

* The decision in this case was handed down March 23, 1897.

This action was brought by the plaintiff's testatrix to restrain the defendants from driving or floating logs down the North Branch of the Moose river.

After the commencement of the action, Julia L. De Camp died, and her husband, William S. De Camp, was substituted as plaintiff in her stead.

The testatrix, during her lifetime, was the owner of the north half of township 1, and of the whole of township 7, in what is known as the "John Brown Tract," in the town of Wilmurt and county of Herkimer.

The North Branch flows from First lake in township 8, which is contiguous to and east of township 7, over the lands of the testatrix, in townships 7 and 1, for a distance of about twenty miles, to a place called "McKeever," where it is joined by the South Branch of the same river.

These two branches form Moose river, which empties into the Black river at Lyons Falls, about thirty miles east of the junction.

Just after the North Branch crosses the east line of township 7, a tributary from Big Safford lake, which lies at the north, empties into it. This is called "Big Safford creek," and some fifteen miles further east another and a larger stream called "Middle Branch," also empties into the North Branch, the two tributaries increasing the volume of water in the last-mentioned stream one-third.

In February, 1894, the defendants purchased of Dr. Seward Webb a large quantity of soft wood timber and the stumpage rights of the Moose river watershed in township 8, upon the assumption that they had the right to float the logs cut therefrom upon the waters of the North Branch to their sawmill at McKeever, and during that year they cut about 11,000,000 feet of timber into logs varying from 13 to 16 feet in length, and placed about 1,500,000 feet thereof on the ice at Big Safford lake, and between 4,000,000 and 5,000,000 feet on the ice at First lake, the remainder being placed along the banks of the North Branch below First lake and in township 8.

In order to float these logs upon the Big Safford creek and North Branch, a dam was constructed by the defendants at Big Safford lake, and flood jams were cut out of both streams. In the lat-

ter part of April, 1895, the defendants commenced to float or
"drive" their logs down the streams to their mill at McKeever.
During the season of 1895, they cut about 13,000,000 additional feet
of timber with the intention of transporting the same to their mill
in like manner as the timber cut the previous season.

In 1851, the Legislature of this State passed an act (Laws of
1851, chap. 207) declaring the North Branch of Moose river a pub-
lic highway for the floating of logs and timber. This act was
amended by chapter 712 of the Laws of 1894 in such a manner as
to enable any person desirous of floating logs or timber down the
North Branch to construct a chute or apron in connection with
any dam across the stream, and to reconstruct any booms already
constructed upon paying, in the manner therein provided, such
damage as might be sustained by the owner or occupant of the
booms.

This action was commenced in November, 1894, and a temporary
injunction was thereafter obtained which prevented the defendants
from floating all the timber which had been cut by them on town-
ship 8. Subsequently the issues were referred to a referee before
whom the same were tried; thereafter the report of the referee in
favor of the plaintiff was filed, upon which a judgment was duly
entered, and from that judgment this appeal is brought.

*Charles E. Snyder,* for the appellants.

*C. D. Adams,* for the respondent.

ADAMS, J. :

Three defenses were interposed to this action by the defendants,
and the questions which they severally present are relied upon for
a reversal of the judgment appealed from. Stated in the order
in which we propose to consider them, these defenses are as
follows, viz.: (1) That the defendants are entitled to float logs
in the North Branch, as a right of way, by necessity; (2) that the
North Branch of the Moose river and Big Safford creek are public
highways at common law for the floating of logs and timber; (3)
that the North Branch of Moose river has been declared a public
highway by the statutes of this State.

The defendants' first proposition is based upon the claim that Mrs. De Camp acquired title to part of the land over which the North Branch flows from the same source as Dr. Seward Webb, and that her deed was subsequent in point of time to the deed of Dr. Webb; that there is no other way at present for the defendants to market their lumber, except by floating their logs down the North Branch, and that consequently they are entitled to use that stream as a right of way by necessity.

In examining the defendants' elaborate brief it is quite apparent that but little reliance is placed upon this proposition, and probably no serious disappointment will result if the same fails to receive favorable consideration. It is sufficient, therefore, to say that while it would undoubtedly be cheaper and far more convenient for the defendants to float their logs down the waters of the North Branch than to send them to their mill by some different method, it does not appear that there is no other means of getting them there. On the contrary, it is established by evidence which is undisputed that when the defendants bought this timber there was a railroad in operation upon township 8, by which they shipped their bark and which must have been equally available for the transportation of their logs.

This being the situation, it necessarily disposes of any claim that the right of way over the stream in question was created by the necessity of the case. We pass, therefore, to the consideration of the defendants' contention that Big Safford creek and the North Branch of Moose river are public highways at common law.

It is undoubtedly a well-settled principle of law, and one which has for many centuries been incorporated into the common law of England, as well as of this country from its earliest history, that fresh water streams which are non-navigable, in the sense that they are not affected by the ebb and flow of the tide, belong to the riparian owners, subject, nevertheless, to a paramount right in the public to use the same for the transportation of such craft or property as can be floated upon their waters in their natural state.

The distinctions between the rights of the public and those of individuals in fresh water streams are clearly defined by Sir Matthew Hale in his *De Jure Maris*, a treatise upon this subject, which has been invested by more recent writers with a quality of infallibility,

and of which it was said by a learned commentator early in the present century, that "the general distinctions * * * which at this day no lawyer will hazard his reputation by controverting, are, that rivers not navigable, that is, fresh rivers of what kind soever, do, of common right, belong to the owners of the soil adjacent, to the extent of their land in length. But that rivers where the tide ebbs and flows belong, of common right, to the State. That this ownership of the citizen is of the whole river, viz.: the soil and the water of the river; except that in his river where boats, rafts, etc., may be floated to market, the public have a right of way or easement." (*Ex parte Jennings*, 6 Cow. 518; see note p. 543.)

The principle thus enunciated has received frequent recognition from the courts of this State, and must be regarded as controlling in this case. (*Palmer* v. *Mulligan*, 3 Caines, 315; *Shaw* v. *Crawford*, 10 Johns. 237; *Hooker* v. *Cummings*, 20 id. 90; *Brown* v. *Scofield*, 8 Barb. 239; *Morgan* v. *King*, 35 N. Y. 459; *Town of Pierrepont* v. *Loveless*, 72 id. 211.) But it is to be observed that the easement which the public has in streams of this character is limited to their navigable capacity.

If the waters in their natural condition are sufficient in capacity and quantity to accommodate rafts, then logs may be thus transported upon their surface; but, if insufficient for such an use, the logs may be floated singly or in quantities, as the case may be; but whatever use is made of the waters of such a stream, it must be one which is adapted to the stream in its natural condition, unaided by any artificial means. (*Moore* v. *Sanborne*, 2 Mich. 526.)

What is the natural condition of such inland rivers as possess no historic consequence is a fact to be ascertained by proofs, and one of which the courts cannot take judicial notice. (*Buffalo Pipe Line Co.* v. *N. Y., etc., R. R. Co.*, 10 Abb. N. C. 107.)

In determining the question which we are now considering it becomes necessary, therefore, to look somewhat into the facts of the case. The learned referee has found, upon evidence which clearly supports his findings, that the North Branch of Moose river, from the east line of township 7 to its junction with the Middle Branch, is, except during the spring floods and freshets, of the average width of thirty feet and of the average depth of two feet, and that after

such junction the volume of water is increased one-third; that it is a tortuous stream, with many bends and turns, and with a current of but two miles an hour, except in places where there are rapids; that at some points the banks are very low, extending but little above the surface of the stream in ordinary water, and that in other places the flow of the water is obstructed by rocks and rapids, which form an obstacle to the floating of logs in either low or high water; that prior to the defendants' purchase there were a large number of accretions of logs and earth, called "flood jams," which presented a complete obstruction to the floating of logs; that Big Safford creek, before it empties into the North Branch, is a stream about seven miles in length, of the average width of twelve feet and of the average depth of ten inches, its natural condition in other respects being essentially the same as that of the North Branch.

With these characteristics of the two streams established, it would seem to be a somewhat difficult undertaking to successfully contend that either was a public highway to the extent and for the purposes for which the defendants have attempted to use them. In saying this, however, we do not lose sight of the fact that it is not pretended that the capacity of these streams is sufficient to enable the defendants to float their logs thereon at all seasons of the year, but, on the contrary, it is admitted that only during the spring freshets, a period of but three or four weeks, can either stream be thus utilized.

It remains, therefore, to be determined whether, even for this brief period, the waters of either Big Safford creek or the North Branch are sufficient in capacity to admit of their use by the defendants for floating such an immense quantity of logs.

In this connection it may be stated that the capacity which shall be sufficient for such purpose need not be continuous, provided it results from natural causes only and exists long enough to enable the defendants to float their logs to their mill.

In determining this very important question recourse may be had once more to the decision of the learned referee who, upon evidence which is adequate, finds that during the period of high water in the North Branch and Big Safford creek, it was both practicable and profitable to float and drive logs and timber in large quantities over the lands of the plaintiff to the defendants' mill, but only with the aid of artificial means; that to accomplish this object the defendants, in

the month of October, 1894, constructed a dam on Big Safford creek at its outlet from Big Safford lake, of about nine feet in height, to enable them to float their logs from the lake into the creek over the lands of Mrs. De Camp to the North Branch, and to increase the volume of water from time to time in the latter stream; that for the same purpose the defendants cut the trees and brush on the banks of Big Safford creek twelve feet back on each side of the stream for the distance of two miles, upon Mrs. De Camp's land; that in attempting to drive their logs through the stream the defendants employed a large number of men, who were frequently obliged to go, and did go, upon her land, and who were obliged to use, and did use, force to aid the passage of their logs, and to that end pried the same off from the banks of the stream and the boulders in the bed thereof, with pevies and cant dogs, and did also remove and displace to some extent the rocks and boulders in the bed of the streams; that they likewise blasted the rocks upon Mrs. De Camp's premises, and, as the season extended, made use of other dams to bring down logs which had been stranded along the banks of the stream.

It is further found by the learned referee that in the year 1872 or 1873, Norcross & Gregg placed about 16,000 logs in the North Branch, a short distance above the Middle Branch, and endeavored to float them down the stream; that about 3,000 of these logs were floated through Indian Rapids; that the " drive " stranded near Nelson lake, and that this, so far as the evidence discloses, was the only attempt ever made, prior to that of the defendants, to float logs in considerable quantities in the North Branch from a point above the Middle Branch.

It is also made to appear by the evidence in the case, that while the defendants were engaged in driving their logs through the North Branch the entire surface of the stream was covered, to the practical exclusion of any other person who might desire to use the same, and that a large number of these logs were left upon Mrs. De Camp's land by reason of the lack of either time or water to get them to their destination.

It likewise appears that at one point where there was a bend in the stream a channel some ten or eighteen feet in length had been cut across the bend, which shortened the distance fifty feet or more,

and to that extent facilitated the driving of the logs, but it is only fair to say that there is only presumptive evidence that this channel was cut by the defendants.

Other facts and circumstances of a similar nature might be cited, but we think those already stated are amply sufficient to justify the conclusion of the learned referee that the North Branch of the Moose river, in its natural state, is not a public highway at common law for the purpose of floating logs and timber. Before dismissing this branch of the case, however, it is due to the defendants that it shall be considered in the light of another item of evidence, which is to the effect that at one time the plaintiff or his wife navigated a portion of the North Branch with a small steamboat, upon which both passengers and freight were transported. And it is argued from this fact, that if the water of the stream was of sufficient capacity to float a steamboat drawing two feet of water, during the summer months, it must have been sufficient to have floated the defendant's logs during the period of high water.

But it appears that only a part of the stream was used for the navigation of this boat, and that the part thus used was rendered fit for such purpose by the operation of artificial means. This being so, we are unable to see how it aids the defendants in their contention, for if the plaintiff, by the expenditure of money, causes a private stream to become navigable for his own personal convenience and accommodation, it by no means follows that the public thereby acquires any greater or other right in the waters of such stream.

In support of this proposition we quote once more from Sir Matthew Hale, who, in the chapter of his *De Jure Maris* which relates to public streams, thus quaintly states the rule which should apply in such a case : "But if any person at his own charge, makes his own private stream to be passable for boats or barges, either by making of locks or cut*t*s, or drawing together other streams ; and thereby that river, which was his own in point of propriety becomes now capable of carriage of vessels ; yet this seems not to make it *juris publici ;* and he may pull it down again, or apply it to his own private use. For it is not hereby made to be *juris publici,* unless it were done at a common charge ; or by a public*k* authority ; or that by long continuance of time it hath been freely devoted to a public*k* use."

We come now to consider the defendants' third proposition, and the one in which they appear to repose the greatest confidence, viz. : That the North Branch of the Moose river has been declared a public highway by the statutes of this State.

As has already been shown, such is the plain language of the act of 1851, which doubtless was designed by the Legislature to create a highway for the particular purposes there indicated. Neither this act nor the amendment of 1894, however, provides any compensation to owners for the lands taken for such highway, nor for the improvements in the bed of the steam which may become necessary before it can be used for highway purposes, as has been adjudged in a recent case to which these defendants were parties. (*Matter of Thomson*, 86 Hun, 406; affd., 147 N. Y. 701.) It must necessarily follow, therefore, that the act is in contravention of the fundamental law of the State, which provides that private property shall not be taken for public use without just compensation. (Const. art. 1, § 6; *Morgan* v. *King, supra ; Chenango Bridge Co.* v. *Paige,* 83 N. Y. 178.) This much, we assume, will not be controverted by the defendants, who rest their contention upon quite a different basis.

It seems that the original owner of townships 1 and 7 was one Alexander Macomb, who derived his title from the State in the year 1792 by letters patent, which contained the following reservation, viz. : " * * * excepting and reserving to ourselves all gold and silver mines, and five acres of every hundred acres of the said tract of land, for highways."

. When the defendants failed in their condemnation proceedings (*In re Thomson, supra*) they amended their answer herein by setting up the Macomb patent as the source of the plaintiff's title, and alleging that the North Branch of the Moose river does not cover 5 acres out of every 100 acres through which it passes in township 7. The learned referee found this to be the fact, and the contention now is that, in declaring the North Branch a public highway, the Legislature intended to exercise the power which was reserved in the Macomb patent, to erect highways upon the lands thereby conveyed. The argument in support of this contention is made to rest largely upon the question of legislative power, the claim being that, inasmuch as the power to use these five acres for highway purposes

resided in the Legislature, it must be assumed that that body intended to exercise such power when it enacted the statute of 1851.

It may be admitted, for the purpose of this appeal, that the constitutionality of a given act generally involves the question of legislative power; but, nevertheless, the Legislature may not have intended to avail itself of this power, and, therefore, in giving construction to the act we are now considering, the element of intent is quite as likely to prove important and controlling as is that of power.

It is too well settled to admit of doubt that, in giving construction to a statute, the courts may always, when necessary, inquire into the intent of the Legislature in enacting the same. Thus it was held in *Tonnele* v. *Hall* (4 N. Y. 140) that a statute ought to receive such a construction as will best answer the intention of the makers; and that such intention may sometimes be ascertained by referring to the causes which led to the enactment of the statute. Again, in *Smith* v. *The People* (47 N. Y. 330) it was held that, in construing statutes, effect must be given to the intent of the Legislature whenever it can be discerned.

Adopting, therefore, this rule in our effort to construe the act of 1851, what other meaning can be given to its perfectly plain language than the obvious one, that it was designed to furnish the owners of timber lands upon the John Brown tract an outlet for their logs through the waters of the North Branch of Moose river, not in virtue of the power reserved in the Macomb patent, but rather by reason of the power which was supposed to reside in the Legislature to establish such a highway without providing for compensation to riparian owners?

This view is strengthened by the fact that this is but one of many similar acts relating to various streams of water in different parts of the State, running over and through lands in which, so far as we are aware, no rights or interests were reserved to the State.

But, again, if the reservation contained in the Macomb patent was within the contemplation of the Legislature in enacting the statute of 1851, it is not unreasonable to assume that some reference would have been made to such reservation and some means provided for ascertaining what portion of the lands available for highway purposes was covered by the waters of the North Branch.

In this connection it should be remembered that the reservation was equivalent to five per cent of all the lands embraced in the Macomb patent; and that while it appears that there are no highways aside from this stream on township 7, it does not appear that the reservation has not long since been exhausted by the establishing of highways in other parts of the tract. To meet this obstacle, it is claimed by the defendants that each and every acre of the entire tract is subject to the five per cent reservation. But this contention has only to be stated to make obvious its fallacy. For, if it were to be adopted, the necessary result would be that if the State, under the power reserved in the Macomb patent, had devoted five per cent of all the lands therein described to highway purposes, and located them in township 8, it might, nevertheless, appropriate five per cent of each acre in township 7 to the same purposes.

The defendants' theory of this branch of the case has been presented with great skill and no little ingenuity, but one strong argument against it is furnished in the fact that it was not regarded as worthy of adoption until it was made apparent by the decision in the condemnation proceedings that the act of 1851 was obnoxious to the Constitution in consequence of its omission to provide for compensation to the landowners.

We have examined the several authorities cited by the defendants' counsel in support of his contention, and especially those which arose in the State of Pennsylvania, but we are unable to discover that they establish the doctrine for which he contends. In the case of *Commonwealth* v. *Fisher* (1 Penrose & Watts, 462) the court does not assume to construe the act upon which the action arose, but, in deciding the claim for damages of the owners of lands taken by the State for a canal, discusses incidentally the right of the State to appropriate 6 acres out of every 100 acres for highways, and in so doing uses this language : " The right of the State to take six acres out of every hundred acres sold is not an implied right, but an express reservation." " These six acres were never paid for by the applicant. *They were not any particular and specific or designated six acres,* but they were thrown in, that whenever the commonwealth thought a public road necessary through any part of the State it might make it without interfering with the private right of any individual."

This, it seems to us, is quite in harmony with the views to which we have attempted to give expression, and which may be thus briefly summarized, viz. :

(1) That in and by the Macomb patent the State did expressly reserve to itself for highway purposes 5 acres out of every 100 acres of land thereby conveyed ; (2) that the land thus reserved was not specifically designated, but related to the entire tract; (3) that the power thus reserved authorized the State, at any time, to appropriate five per cent of the land embraced in this tract to highway purposes ; (4) that in the absence of any language in the act of 1851 showing that such was the intent of the Legislature, it will not be presumed that in declaring the North Branch of Moose river a highway for a particular purpose, without providing for compensation to riparian owners, there was any exercise of the power reserved by the Macomb patent, at least until it is made to appear that such power has not already been exhausted.

There is another question arising in this case to which but little attention has been devoted by counsel in their briefs, but which, it seems to us, is worthy of consideration. The act of 1851 declared the North Branch of Moose river a public highway, not for all purposes, nor for the public generally, but for the one single purpose of floating logs and timber. It does not require an adept at reading between the lines to discover that this statute was evidently designed for the convenience of the individual owners of timber lands in the vicinity of this stream. If this be so, then it may well be doubted whether this attempted exercise by the Legislature of the right of eminent domain possesses any validity, for the land or water appropriated for the highway would, in such a case, be taken for a private and not a public use. (*Embury* v. *Conner*, 3 N. Y. 511; *In re Deansville Cemetery Assn.*, 66 id. 569 ; *Matter of Split Rock Cable Road Co.*, 128 id. 408; *Matter of Burns, ante*, p. 507.) But we do not deem it necessary to express an opinion in regard to this question, inasmuch as we are satisfied that the case was correctly decided by the learned referee and that the judgment appealed from must be affirmed.

It is proper to add, however, that in reaching this conclusion we are not unmindful of its far-reaching consequences, nor are we oblivious to the duty resting upon this court to resort to every rea-

sonable method which is attainable to uphold the statute under consideration, and to reconcile the same with the fundamental law of the State. But, after giving to the case the careful and critical examination which its vast importance demands, we find ourselves unable to regard as tenable either of the propositions advanced with so much ability by the learned counsel for the defendants.

The judgment should be affirmed, with costs.

All concurred.

Judgment affirmed, with costs.