Argued 17 July, decided 20 August, 1907.

## KAMM v. NORMAND.

91 Pac. 448; 11 L. R. A. (N. S.) 290.

WHAT STREAMS ARE NAVIGABLE—FLOATAGE OF LOGS.

1. In Oregon streams which in their natural state, whether with the usual volume of water or during ordinary recurring freshets, can be profitably used for purposes of commerce, are navigable and must be considered public highways for such purposes.

NAVIGABLE WATERS—INCREASING VOLUME BY DAMS—FLOODING*

2. A stream not a natural highway for commercial purposes cannot be made so by means of dams or causing sudden floods to the injury of riparian owners, though the use of streams may be improved by dikes or dams that do not materially interfere with the natural flow: *Union Power Co.* v. *Lichty.* 42 Or. 563, distinguished.

FLOATAGE OF LOGS—EVIDENCE.

3. The evidence shows that the North Fork of Klaskanie River, in its natural state, cannot be successfully used for floating logs to tide level, except at extreme high water, which usually lasts but a few hours.

FLOATABLE STREAM.

4. A stream that in its natural condition will not carry saw logs, except at times of very high water, which usually lasts but a few hours, and then only small and medium sized logs. is not a navigable stream or a highway for the purpose of floatage.

PUBLIC ADVANTAGE NOT A TEST OF NAVIGABILITY.

5. The navigable or floatable capacity of a stream cannot be determined or affected by its importance to public or private interests, and any rights claimed must be based on the actual condition of the stream or upon some constitutional proceeding, confiscation being a method of acquiring property not recognized by the courts of the United States.

From Clatsop: THOMAS A. McBRIDE, Judge.

Statement by MR. CHIEF JUSTICE BEAN.

This is a suit by Jacob Kamm to enjoin Alex and Fred Normand from using the North Fork of Klaskanie Creek for floating saw logs. The complaint alleges that the stream in question runs through plaintiff's land for a distance of about one-half mile, and that it is not navigable or floatable for rafts, logs, lumber or timber; that the defendants cut and put into the channel above plaintiff's premises large quantities of saw logs, and, in order to cause them to float down such stream, con-

*NOTE.—See notes in 41 L. R. A. 371-379, Right to Use Streams for Floating. Logs; 41 L. R. A. 494-497, Liability for Injuries to Riparian Owner by Running Logs in Stream; 85 Am. St. Rep. 707-735, The Right of One Land Owner to Accelerate or Diminish the Flow of Water to or From the Lands of Another.
REPORTER.

structed a splash dam, whereby a large volume of water was accumulated and suddenly released and permitted to flow down the stream, forcing the logs on plaintiff's land in great numbers, cutting and breaking the banks, and otherwise damaging his premises; and that, unless enjoined and restrained, defendants will continue to so use the stream, to plaintiff's irreparable damage. Defendants admit, by their answer, that they are engaged in the logging business on the stream above the lands of plaintiff, and that they have constructed therein a splash dam for use in their logging operations. But they allege that the stream is navigable and suitable for the floatage of saw logs and other timber products where it runs through and for several miles above plaintiff's lands; that they are the owners of large tracts of valuable timber lands on the stream, and the only way the timber can be marketed is by floating it down such stream; that the stream is not navigable at all stages of the water, but has well-defined banks on either side; that in October, 1903, they constructed, at great expense, about two miles above the premises of plaintiff, a splash dam for the purpose of aiding and assisting the floatage of logs; that such dam is so constructed and operated as to be a benefit to plaintiff, since it is possible thereby to control the water and prevent it from overflowing the banks or reaching the height of ordinary freshets; and that logs floated down stream by use of the dam do less injury to plaintiff's premises than if floated without such dam. Upon a trial the court found the averments of the answer to be substantially true, and dismissed the suit, and plaintiff appeals.                                              REVERSED.

For appellant there was a brief over the names of *Dolph, Mallory, Simon & Gearin* and *Frank J. Taylor,* with oral arguments by *Mr. John M. Gearin* and *Mr. Taylor.*

For respondents there was a brief over the name of *Fulton Brothers,* with oral arguments by *Mr. George Clyde Fulton* and *Mr. Charles Erskine Scott Wood.*

Opinion by MR. CHIEF JUSTICE BEAN.

The questions for determination on this appeal are: (1) Whether the Klaskanie, where it flows through the lands of plaintiff, is a navigable or floatable stream; (2) to what extent, if any, the defendants may render it navigable or assist the navigability thereof by means of a splash dam.

1. The common law of England, that the only streams which are navigable are those in which the tide ebbs and flows, has never been adopted in this country. Rules which reason and convenience may have approved in reference to the streams of that country are wholly inapplicable to our waterways, natural resources and conditions, and it is now considered here that any stream which can be used in its natural state for commercial purposes is navigable. The existence of immense bodies of timber in Maine, Michigan and other states, which could be transported to market only by use of adjacent streams, influenced the courts to early hold that any stream which is capable in its natural condition of being commonly and generally used for floating saw logs at periods of high water is navigable or floatable for the transportation of the timber along its banks. This doctrine has been accepted and declared by this court, and the courts of this country generally, until now it may be regarded as settled that streams, which in their natural condition are useful for the transportation of saw logs during the whole or part of each year, are highways for that purpose: *Brown* v. *Chadbourne*, 31 Me. 9 (1 Am. Rep. 641); *Moore* v. *Sanborne*, 2 Mich. 520 (59 Am. Dec. 209); *Weise* v. *Smith*, 3 Or. 445 (8 Am. Rep. 621); *Shaw* v. *Oswego Iron Co.* 10 Or. 371 (45 Am. Rep. 146); *Haines* v. *Welch*, 14 Or. 319 (12 Pac. 502); *Haines* v. *Hall*, 17 Or. 165 (20 Pac. 831: 3 L. R. A. 609); *Nutter* v. *Gallagher*, 19 Or. 375 (24 Pac. 250); *Hallock* v. *Suitor*, 37 Or. 9 (60 Pac. 384); 27 Cyc. 1566; 21 Am. & Eng. Enc. Law (2 ed.), 428. But streams which are not of sufficient size and capacity to be profitably so used are wholly and absolutely private: *Munson* v. *Hungerford*, 6 Barb. 265; *Wadsworth* v. *Smith*, 11 Me. 278 (26 Am. Dec. 525). "The true test, therefore, to be applied in such cases," says the Supreme Court of

Maine, in *Brown* v. *Chadbourne*, 31 Me. 9 (1 Am. Rep. 641), "is whether a stream is inherently and in its nature capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts or logs." It is not necessary that the stream should be floatable at all seasons of the year. It is sufficient if it has that character at different periods, recurring with reasonable certainty, and continuing for a sufficient length of time to make it commercially profitable and beneficial to the general public. But every small creek or rivulet in which logs can be made to float for a few hours during a freshet is not a public highway. To make a stream a highway, it must at least be navigable or floatable in its natural state, at ordinary recurring winter freshets, long enough to make it useful for some purposes of trade or agriculture: *People ex rel.* v. *Elk River M. & L. Co.* 107 Cal. 221 (40 Pac. 531: 48 Am. St. Rep. 125); *Rowe* v. *Granite Bridge Corp.* 21 Pick. 344; *Morgan* v. *King,* 18 Barb. 277 (35 N. Y. 454: 91 Am. Dec. 67); *Banks* v. *Frazier,* 111 Ky. 909 (64 S. W. 983); *Commissioners of Burke County* v. *Catawba Lum. Co.* 115 N. C. 590 (20 S. E. 707, 847); *Lewis* v. *Coffee Co.* 77 Ala. 190 (54 Am. Rep. 55); *Hubbard* v. *Bell,* 54 Ill. 110 (5 Am. Rep. 98); *Carlson* v. *St. Louis River D. & I. Co.* 73 Minn. 128 (75 N. W. 1044: 72 Am. St. Rep. 610: 41 L. R. A. 371, note); 1 Farnham, Waters, 121; Gould, Waters, §§ 107-109.

"The true rule is," says the Supreme Court of New York, in *Morgan* v. *King,* 35 N. Y. 460 (91 Am. Dec. 67), "that the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines or of the tillage of the soil upon its banks. It is not essential to the right that the property to be transported should be carried in vessels, or in some other mode whereby it can be guided by the agency of man, provided it can ordinarily be carried safely without such guidance. Nor is it necessary that the stream should be capable of being thus navigated against its current, as well as in the direction of its current. If it is so far navigable or floatable, in its natural state and its ordinary ca-

pacity, as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported. Nor is it essential to the easement that the capacity of the stream, as above defined, should be continuous or, in other words, that its ordinary state at all seasons of the year should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement: These general views are in harmony with those maintained by the Supreme Court of Maine in *Brown* v. *Chadbourne,* 31 Me. 9 (1 Am. Rep. 641), and by the Supreme Court of Michigan, in *Moore* v. *Sanborne,* 1 Gibbs, 519." And this is the rule adopted in this state. In *Weise* v. *Smith,* 3 Or. 445 (8 Am. Rep. 621), it is said "that if a stream is in fact capable, in its natural condition, of being profitably used for any kind of navigation, its use is to that extent subjected to the general rules of law relating to navigation applicable to the circumstances of the case." And in *Haines* v. *Welch,* 14 Or. 319 (12 Pac. 502), Mr. Justice THAYER says: "If it (Anthony Creek) is capable of serving an important public use as a channel for commerce, it should be considered public; but if it is only a brook, although it might carry down saw logs for a few days during a freshet, it is not, therefore, a public highway." And in *Haines* v. *Hall,* 17 Or. 165 (3 L. R. A. 609 : 20 Pac. 831), in speaking of the same stream, the court said: "Whether the creek in question is navigable or not for the purposes for which the appellant used it depends upon its capacity in a natural state to float logs and timber, and whether its use for that purpose will be an advantage to the public. If its location is such and its length and capacity so limited that it will only accommodate a few persons, it cannot be considered a navigable stream for any purpose. It must be so situated as to have such length and capacity as will enable it to accommodate the public generally as a means of transportation."

The doctrine, then, which we derive from the authorities, is that a stream, to be a public highway for floatage, must be capable, in its natural condition and at the ordinary winter stages of water, of valuable public use, and, if not, it is private property. Ordinary stages of water or natural conditions, within this rule, do not mean a continuous state of floatage or an average volume of water. The term has reference to the natural flow of the water, and is applied to the stream in its natural condition, without the application of artificial means, and is used in contradistinction to extraordinary or unusual floods. That which occurs with reasonable certainty, periodically, can hardly be said to be unusual, and much less extraordinary, and may be properly characterized as ordinary. A stream, therefore, that is capable of floating logs, unaided by artificial means, during freshets or stages of water occurring with reasonable frequency and continuing long enough to make its use of commercial value, is a public highway for that purpose.

2. But a stream which is not such a highway cannot be made one by the use of dams or other artificial means, without first acquiring the rights of riparian proprietors: 1 Farnham, Waters, § 139. Nor can a stream, navigable in its natural condition at certain stages of the water, be made so at other times by artificial means, such as flooding and the like. No one has a right to store water, and then suddenly release the accumulation, and thus increase the natural volume of the stream, and overflow, injure or wash the adjoining banks, or otherwise interfere with the rights of riparian owners. The riparian proprietor is entitled to the enjoyment of the natural flow of the stream with no burden or hindrance imposed by artificial means: *Brewster* v. *Rogers Co.* 169 N. Y. 73 (62 N. E. 164: 58 L. R. A. 495); *Thunder Bay Booming Co.* v. *Speechly,* 31 Mich. 336 (18 Am. Rep. 184); *Witheral* v. *Muskegon Booming Co.* 68 Mich. 48 (35 N. W. 758: 13 Am. St. Rep. 325); *Koopman* v. *Blodgett,* 70 Mich. 610 (38 N. W. 649: 14 Am. St. Rep. 527); *Matthews* v. *Belfast Mfg. Co.* 35 Wash. 662 (77 Pac. 1046); *Monroe Mill Co.* v. *Menzel,* 35 Wash. 487 (77 Pac. 813: 70 L. R. A. 272: 102 Am. St. Rep. 905); *Ford Lum. & Mfg. Co.* v. *Clark* (Ky.),

68 S. W. 443; *Kentucky Lum. Co.* v. *Miracle,* 101 Ky. 364 (41 S. W. 25); *De Camp* v. *Thomson,* 16 App. Div. 528 (44 N. Y. Supp. 1114).

Dams, dikes, embankments and the like may be constructed in or along floatable streams to facilitate their use (*Union Power Co.* v. *Lichty,* 42 Or. 563: 71 Pac. 1044), but not to the extent of injuring the riparian proprietors by retarding the flow of the water or sending it down in increased volumes to his injury or at times when the stream would not otherwise be navigable. And this rule is not changed by the fact that a stream cannot be successfully used for logging purposes without such artificial aids to navigation on the ground of necessity. In *Thunder Bay Booming Co.* v. *Speechly,* 31 Mich. 336 (18 Am. Rep. 184), and *Koopman* v. *Blodgett,* 70 Mich. 610 (14 Am. St. Rep. 527: 38 N. W. 649), the Supreme Court of Michigan had occasion to consider the right to make a stream which is navigable only at certain seasons of the year navigable at other times by impounding the water until a flow sufficient to float logs could be caused. In the former case, Mr. Justice COOLEY, after reviewing the Maine and Michigan cases, quoting with approval what is said to be the true rule by the New York Court of Appeals, noting the fact that all the cases carefully restrict within the bounds of capability for use in their ordinary and natural condition the public easement in streams navigable only at certain seasons of the year, and holding that a stream is navigable during the period the water in its natural condition is sufficient to permit of a public use, says: "During that time the public right of floatage and the private right of the riparian proprietors must each be exercised with due consideration for the other, and any injury which the latter receives in consequence of a proper use of the stream for floatage he must submit to as incident to his situation upon navigable waters: *Middleton* v. *Flat River Boom Co.* 27 Mich. 533. But at periods when there is no highway at all there is no ground for asserting a right to create a highway by means which appropriate or destroy private rights. The doctrine that this may be done without compensation to parties injured is at war with all our ideas of property and of

constitutional rights. The most that can be said of this stream, during the seasons of low water, is that it is capable of being made occasionally navigable by appropriating for the purpose the water to the natural flow of which the riparian proprietors are entitled. It is highly probable, in view of the large interests which are concerned in the floatage, that the general public good would be subserved by so doing; but this fact can have no bearing upon the legal question. It is often the case that the public good would be subserved by forcing a public way through private possessions; but it neither should be nor can be done under any circumstances without observing the only condition on which it can be permitted in constitutional government, namely, that the private proprietor be compensated for the value which he surrenders to the public. * * As was remarked in *Morgan* v. *King,* 35 N. Y. 460 (91 Am. Dec. 67), the question of public right in a case like this is to be decided without reference to the effect which artificial improvements have had in the navigable capacity of the river; in other words, the public right is measured by the capacity of the stream for valuable public use in its natural condition, and any attempt to create capacity at other times at the expense of private interests can be justified only on an assessment and payment of compensation." *Monroe Mill Co.* v. *Menzel,* 35 Wash. 487 (70 L. R. A. 272: 102 Am. St. Rep. 905: 77 Pac. 813), was a suit to enjoin the defendant from using the West Fork of Woods Creek for floating shingle bolts and from maintaining a splash dam thereon. The court held the stream to be navigable or floatable during the freshets which occur with periodic regularity in the spring and fall of each year, but that the detention of the water by means of a dam, and the release thereof at irregular intervals, causing the stream to overflow and washing the lands of the lower riparian proprietor, was such an interference with the natural flow of the water as would be enjoined. And in *Matthews* v. *Belfast Mfg. Co.* 35 Wash. 662 (77 Pac. 1046), it was held that the floating of logs down a stream, by means of dams and artificial freshets, at the time of the year when it is not navigable in its natural state, is an abuse of the right of

navigation for which an injunction will lie at the suit of riparian owners injured thereby, and that a private corporation which is not a boom company is not entitled to exercise the right of eminent domain against a lower riparian owner, for the purpose of facilitating the floating of logs down a stream by means of dams and artificial freshets, which damages the lower proprietor and interferes with his use of the stream. In fact, our attention has not been called to a case, nor have we been able to find one, sustaining the right to maintain dams or other artificial structures in a stream whereby the water is impounded and let down in such a head or volume as to make the stream navigable, when it would not otherwise be so, unless it be in the states of Maine, Wisconsin and Minnesota, where the construction of dams in floatable streams to facilitate their use is authorized by statute : *Brooks* v. *Cedar Brook, etc., Imp. Co.* 82 Me. 17 (19 Atl. 87 : 7 L. R. A. 460 : 17 Am. St. Rep. 459) ; *Kretzschmar* v. *Meehan,* 74 Minn. 211 (77 N. W. 41) ; *Field* v. *Apple River Log Driving Co.* 67 Wis. 569 (31 N. W. 17).

3. Having thus ascertained that a stream, to be navigable or floatable for saw logs, must be capable in its natural condition at ordinary recurring freshets of being successfully and profitably used for that purpose, and that a stream not navigable or floatable in its natural condition cannot be made so by artificial means, nor can the capacity of a navigable stream be increased by such means to the injury of a riparian proprietor without compensation, we are now prepared to consider the facts of the particular case before us and determine the respective rights of the parties litigant. The plaintiff is the owner of 480 acres of land, most of which is bottom or meadow land and has been extensively improved and used as such. Through this land, from the north and east, flows the North Fork of the Klaskanie, for a distance of about one-half mile, to a point a short distance west of plaintiff's land, where it joins another stream from the southeast, called the "South Fork" of the Klaskanie, and the two streams united flow to the west, forming the Klaskanie River. The tide ebbs and flows in the Klaskanie from its mouth

50 Or.—— 2

up to or about the confluence or junction of the two streams referred to, and is conceded by the plaintiff to be navigable to that point. From the junction of the two streams towards its source, the North Fork is a shallow tortuous stream, from 40 to 60 feet wide. For about half the distance through plaintiff's land it consists of riffles or shoals, and the water is but a few inches deep in the summer time, and from one and one-half to two feet deep during the ordinary winter freshets. At places the banks on one side are from four to six feet high; the opposite bank gradually sloping back to the meadow land. The soil is alluvial, and easily eroded in time of high water, and plaintiff has expended large sums of money in constructing embankments and other improvements to preserve the banks. In the fall of 1903 the defendants went upon the stream, about two miles above plaintiff's land, and constructed a dam 28 feet high for use in their logging operations, which dam is provided with four gates—three trip gates, each eight feet wide and 16 feet high, and one slide gate, 6 feet wide and 24 feet high. By means of this dam the defendants are enabled to impound a large volume of water, which they suddenly release and allow to flow down the channel to suit their convenience.

Many witnesses were called and testified in behalf of both parties as to the character and capacity of the stream. They differ as to whether logs can be floated down it without the aid of dams. The witnesses for plaintiff, most of whom are farmers or landowners along the stream or in the vicinity, all concur in opinion that it cannot be so used; while the witnesses for defendants, most of whom are loggers or mill men, are equally positive that it can. But, while the witnesses differ in their opinions, there is no substantial conflict in the facts as testified to by them. They all agree that the stream is not floatable except in times of winter freshets, and that such freshets do not ordinarily occur more than three or four times a year, and continue but a few hours at a time. Christian Peterson, who was plaintiff's foreman, and lived upon his farm for 24 years prior to 1902, testified that during the ordinary winter freshets the water was from one and one-half to two feet deep in the riffles

and shoal places, and would not float logs, but there might be two or three days in the year during which small logs would float down the stream; that the freshets would continue sometimes a couple of hours, and sometimes a half a day, and the water would fall as rapidly as it came up; that some years ago Gilliam and Warnstaff put 80,000 or 90,000 feet of logs in the stream above plaintiff's land, and that only five or six of them had come out, and the remainder were scattered along the banks at the time he left the farm in 1902. John Leahy, who for 20 years has lived about one and one-half miles above plaintiff's premises, testified that the water is from one and one-half to two feet deep in the winter, except in case of unusually high water, which may occur once or twice a year and continue for a few hours at a time; that logs could not be floated at ordinary high water, but they would stop on the bars and along the banks; that more damage was done to the banks during the winter of 1903 by the operation of defendants' splash dam than in the entire 20 years he had lived on the stream, and that logs had been left higher on the banks than by the winter floods; that within three weeks prior to the trial in July, 1904, defendants had flushed down the stream, by means of their dam, about 100,000 feet of logs, which had lodged above his place, and there was great danger of their carrying away his house.

James Leahy, who had lived on the stream above plaintiff's place for more than 20 years, testified that during the winter of 1903 and 1904 there was but one freshet sufficient to float logs, and then only small ones, and that it did not continue for more than three hours; that some years there would be three or four freshets, depending upon the rainfall, but they would only continue two or three hours; that the running of logs by defendants during the winter of 1903 and 1904 caused more damage than the natural wash of the stream for the previous 20 years. Michael Leahy and Charles Gilliam, who live on the stream, say that the water is from two and one-half to three feet deep during the ordinary winter freshets, and not sufficient to float any but small saw logs. Gilliam testified that some 12 or 15 years ago he put 137 logs in the stream and got one out the first

year, and that six or seven of the smaller ones came down to plaintiff's place; that he tried to get the logs out, but could not do so for want of water, and had to abandon the enterprise; that logs would go down from a quarter to a half mile during a freshet, and then the water would recede and leave them in the channels of the stream or along the banks; that some of the logs were still in the stream, and others came out during the winter of 1903, when defendants were operating their splash dam; that logs which had laid in the stream for 15 or 16 years and were not carried out by ordinary winter freshets were floated out by water from the splash dam. Stephen Thies, who had charge of plaintiff's farm from April, 1902, to date of trial in July, 1904, testified that during the winter of 1902 and 1903 there were two or three freshets, one of which was extremely high, and continued from 10 to 12 hours; that during ordinary winter freshets the water was from two to three feet deep in shoal places, and not that during the winter of 1903 and 1904; that in June, 1904, the defendants were running logs down the stream by use of their splash dam; that they opened the dam and allowed the accumulated water to come down the stream, bringing logs with it, perhaps 20 times during the winter; that they were not able by this means to get all the logs out, but many of them were left on the banks and lowland along the stream, and there has been no time since defendants commenced the operation of their dam that plaintiff's land has been free of logs. Frank Buxton, who was employed on plaintiff's farm, testified that the stream was flushed by defendants during the winter of 1903 and 1904 from 25 to 30 times, raising the water two or three feet above its natural stage; that there was a rise of water during the winter from natural causes sufficient to float small logs.

Most of the witnesses for defendants do not live on the stream and have no actual knowledge of its conditions, but testified as to their opinion from an examination of the stream and their general knowledge of the climatic conditions of the surrounding country and its waterways. They generally agree that not more than from two to five freshets, sufficient to float logs, may reasonably be expected in the streams of that vicinity each year,

continuing, as a rule, from 6 to 12 hours, but there were no such freshets during the winter of 1903 and 1904. Wallace and J. C. Dunkin, who were employed by defendants, testified that there was not more than one logging freshet during the winter of 1903 and 1904, and that the splash dam operated by defendants would raise the water as high as an ordinary freshet. Fred Normand, one of the defendants, says there are ordinarily from three to five freshets a year, depending upon the amount of rainfall, and last from three to five hours; that defendants' splash dam was constructed in the fall of 1903, and there was once during the succeeding winter that logs would float down the stream in its natural stage; that defendants were careful not to open the dam so as to overflow the banks of the stream and carry the logs out on the meadow, nor in the summer time, "because we do not want to overflow the bottom land." Alex Normand, the other defendant, said that four or five freshets may be reasonably expected each year, and they usually last from 5 to 6 and 10 to 12 hours, and that, by assisting them, "we can run logs for a day and a half or two days"; that their dam will raise the water in the stream about four feet, when a full head is turned down, but hardly as high as an ordinary freshet; that defendants used the dam for scattering logs along the stream, and "to assist them on down, so we can market them and not have to wait for freshets, as we would otherwise have to do"; that during the winter of 1903 and 1904 they were able, by use of their dam, to float down to tide water from 1,700,000 to 2,000,000 feet of logs, for about four miles, which they expected to splash out during the succeeding winter.

4. We have made this extended reference to the testimony because whether a given stream is, in law, navigable or floatable, depends upon the facts, and a decision in one case cannot be regarded as a precedent in another, unless the facts are the same. From the testimony of the witnesses, both for plaintiff and defendants, it is apparent, we think, that the Klaskanie, where it flows through plaintiff's land, is not, in its natural condition, floatable for logs, because it is not capable of serving any important public use. Logs cannot be floated therein except,

perhaps, at extreme high water continuing for a few hours at a time, and then only small logs. It would be going beyond any precedent of which we have knowledge to hold that such a stream is a public highway; and, since it is not such highway in its natural condition, it cannot be made so by means of a splash dam or other artificial structures, without first acquiring the rights of the riparian proprietors.

5. It is suggested that in view of the great lumber interests in the state, the public good would be subserved by holding that streams like the North Fork of the Klaskanie are public highways for the floating of saw logs; but this argument can have no bearing whatever upon the question. The magnitude or importance of any business or industry will not justify the slightest encroachment upon the rights of the citizen, and, unless a stream is in fact navigable or floatable, it cannot be taken or used without the consent of the owner, except by due process of law, however beneficial it might be to private interest or the public itself. It is often the case that the public good would be subserved by taking one man's property for the benefit of the community; but as already quoted from Judge COOLEY, "it neither should be nor can be done under any circumstances without observing the only condition on which it can be permitted in constitutional government, namely, that the private proprietor be compensated for the value which he surrenders to the public."

The decree will be reversed, and one entered here for plaintiff.                                        REVERSED.