[No. 15907.   Department Two.—May 2, 1895.]

# THE PEOPLE EX REL. RICKS WATER COMPANY, APPELLANT, *v.* ELK RIVER MILL AND LUMBER COMPANY, RESPONDENT.

NAVIGABLE STREAM—SOUTH FORK OF ELK RIVER—CONSTRUCTION OF CODE.—Under section 2349 of the Political Code, declaring navigable all streams emptying into Elk river, "which are now, or at any time have been, used for the purpose of floating logs or timber," the south fork of Elk river, which is a small stream insufficient to flow single sawlogs, except during extreme winter freshets, and with the aid of dams to increase the flow of the stream, which use has been found impracticable and abandoned, is not a navigable stream within the meaning of the code.

ID.—STREAM, WHEN FLOATABLE FOR LOGS.—In order that a stream may be floatable for logs, within the meaning of the code, it must be capable of being used to an extent that would make it of some value as a highway, or at least it must appear that the stream could be so used for some portions of the year, and the fact that it could be so used for a few days in the rainy season, with the aid of dams, would not make the river navigable.

ID.—NON-NAVIGABLE STREAM—PUBLIC WAY—POWER OF LEGISLATURE.—If a stream is, in fact, non-navigable, it is not a public way, and the legislature cannot make it such by merely enacting a law declaring it navigable, and so take private property for public use without compensation.

ID.—DAM ACROSS NON-NAVIGABLE STREAM—OBSTRUCTION—PURPRESTURE. The erection of a dam across the bed of a nonnavigable stream is not an actionable obstruction nor a purpresture.

ID.—OBSTRUCTION AND POLLUTION OF STREAM—FINDINGS—REFUSAL OF INJUNCTION.—In an action to restrain the obstruction of a stream by a dam impounding sawlogs for the use of a mill, and from polluting the stream by discoloration from the logs, and by allowing sawdust to find its way into the stream, and by discharging the waste water from the kitchen, and waste matter from the sawmill, and the escape of offal into the stream from privies and a slaughterhouse, where the court finds that the bed of the stream was private property, that the sawdust was burned, and what little got into the stream had no appreciable effect, and that the water was not polluted to such a degree by any or all of the matters complained of as to render it unfit for use or unwholesome, and the evidence sufficiently sustains the findings, and shows that the sources of the alleged pollution, other than the discoloration from the logs, were not over or immediately upon the banks of the stream, the court may properly decline to enjoin the acts complained of.

ID.—RIGHTS OF PEOPLE EMPLOYED AT SAWMILL—REASONABLE PRECAUTIONS AGAINST POLLUTION OF STREAM.—The people employed at a sawmill, comprising a portion of the public, have as much right to live near the banks of a stream as the inhabitants of any community on

the stream below them, if they take all reasonable precautions against unnecessarily polluting the water, and inhabitants and property owners upon the stream cannot be compelled to remove or be expropriated for the benefit of urban communities.

ID.—CONSTRUCTION OF CONSTITUTION—PUBLIC USE OF WATER—COMPENSATION.—Section 1 of article XIV of the state constitution, making water for sale, rental, or distribution a public use, was not intended to appropriate water for the use of the public without compensation.

ID.—CONSTRUCTION OF PENAL CODE—PROPERTY RIGHTS OF RIPARIAN OWNERS.—Section 374 of the Penal Code, making criminal the acts therein specified when the direct effect of such acts is to pollute the waters from which the inhabitants of any city or town are supplied, was not intended to deprive riparian owners of property rights.

ID.—RESTRICTIONS UPON RIGHTS OF OWNERS—PRESUMPTION.—An intention of the legislature to restrict the rights of riparian owners, so as materially to interfere with the value of such rights, will not be presumed when the language of the statute leaves it doubtful.

ID.—PRIORITY OF USE OF STREAM FOR MILL—RIGHTS OF WATER COMPANY—SUPPLY OF TOWN—PROTECTION OF PRIVATE PROPERTY.—Where a riparian owner has expended large means for the erection of a mill and other property connected with his business many years before water was taken from the stream below for the supply of a town, and the use made by the millowner of the stream is a reasonable one, as against lower riparian owners, a water company desiring to supply the inhabitants of a town with water cannot, instead of taking pure water from another source, seek to make the stream more pure for the supply of the town by destroying the property of the millowner without compensation.

ID.—EMINENT DOMAIN—POLICE POWER OF LEGISLATURE.—Although the police power of the legislature is very broad, it cannot thereunder take private property for public use without compensation, when such property can be condemned and paid for.

APPEAL from a judgment of the Superior Court of Humboldt County.

The facts are stated in the opinion of the court.

*Barclay Henley; Henley & Costello, J. N. Gillett, L. F. Puter, Attorney General W. H. H. Hart,* and *E. W. Wilson,* for Appellant.

*Buck & Cutler,* for Respondent.

TEMPLE, J.—This action was brought to restrain the defendant from polluting the waters of Elk river, from which the Ricks Water Company obtains water to sell to the inhabitants of the city of Eureka.

The complaint charges defendant with polluting Elk river: 1. By maintaining its barn, slaughterhouse, corral, and stables so near the stream that the water becomes polluted thereby; 2. By maintaining water-closets so that the drainage from them flows into the stream; 3. By allowing sawdust to find its way into the stream; 4. By discharging into the stream slops from its kitchen; and 5. By impounding a large number of redwood logs in the stream, from which logs a dark, juicy liquid escapes, and which logs are covered with dust and other deleterious substances; by all of which the water is polluted and discolored, so as to be unfit for domestic use.

The court declined to enjoin the defendant from impounding logs in the stream, or from dumping sawdust upon the banks, or from allowing the kitchen drainage to flow into the stream, or to abate the privies as nuisances.

From that portion of the decree and from a refusal to award a new trial plaintiff takes this appeal.

The court did enjoin the defendant from allowing the accumulation of manure and filth on the banks of the stream above its dam, and allowing the washings from the same and from the hogpen to escape into the stream. From that portion of the decree awarding the plaintiff this relief the defendant has appealed.

In a separate count the plaintiff also averred that Elk river is a navigable stream, and was made so by section 2349 of the Political Code; that in 1886 defendant wrongfully constructed, and has ever since maintained, a dam across said stream, whereby said stream has been and is wholly obstructed.

Upon this issue the court found, in effect, that the south fork of Elk river is a small stream insufficient to float single sawlogs, except during extreme winter freshets, and with the aid of dams to increase the flow of the stream; that it is not navigable and was not made so by section 2349 of the Political Code.

By that section all streams emptying into Elk river are declared navigable, "which are now, or at any time

have been, used for the purpose of floating logs or timber." It is found that the south fork of Elk river had been so used in former years during extensive floods and with the aid of dams, but that its use for that purpose was found impracticable, and had been abandoned.

It is contended that the legislative declaration makes the river a navigable stream. I do not think so.

In the first place, it will not be presumed that the language of the act refers to such a use as would not bring the river within the definition of a navigable stream. Conceding that the definition includes all streams floatable for logs, still it must be capable of being used to an extent that would make it of some value as a highway; or at least a stream that would be so used for some portions of the year. That it could be so used for a few days in the rainy season, and by the aid of dams would not make the river navigable.

The court also found that the bed of the stream is private property. Perhaps this is only another finding that the river is non-navigable. If the stream is in fact non-navigable it is not a public way, and the legislature cannot make it such by merely enacting a law declaring it navigable. Private property cannot be taken for a public use without compensation. The fact that a small stream trickles through land which the public proposes to take for a highway does not authorize its being taken without compensation. On this point see Gould on Waters, section 111, and authorities cited in the note.

The finding upon the subject is fully supported by the law and the evidence. The dam is therefore not a purpresture. The charge in the complaint in regard to putting sawdust into the stream is found untrue. It is found that the sawdust is burned, and that such care is taken that very little gets into the water, and that which does reach the stream has no appreciable effect upon the water.

It was also found that the water is not essentially impaired by the waste water from the kitchen, or by the

escape of oily substances or waste matter from the mill, or by the erection of privies or the escape of offal from the slaughterhouse.

It cannot be denied that there was evidence tending to sustain all these findings.

There was evidence which tended to show that the water was not polluted to such a degree by any or all the matters complained of as to render it unfit for use or unwholesome. Even the expert witnesses did not agree upon this proposition. But when the sources of pollution are suppressed which are enjoined by the decree it cannot be said that, aside from the coloring matter which comes from the impounding of the logs, there is evidence that the water is materially polluted.

The evidence shows that the offal from the slaughter-house is not thrown into the stream and does not get into the water; that only a portion of the drainage from the kitchen reaches the stream; that the privies are not over or immediately upon the banks of the stream.

The people who are employed at defendant's mill themselves comprise a portion of the public. They have as much right to live on the south fork of Elk river as the inhabitants of Eureka have to live at Eureka. The one community cannot be suppressed for the benefit of the other.

Since they have the right to live there, they have a right to maintain privies, taking all reasonable precautions against unnecessarily polluting the water. All natural streams, to some extent, operate as sewers. The surface of the land is drained by them, and all industries, as well as mere inhabitancy, tend to add to the impurities of the natural streams.

The inhabitants and property owners upon these streams cannot be compelled to remove from them or be expropriated for the benefit of urban communities.

It is contended that the law of the case is changed by section 1, article XIV, of the state constitution, which makes the use of water for sale, rental, or distribution

a public use. Certainly it was not intended by that provision to appropriate such water for the use of the public without compensation. The section recognizes the use as one in behalf of which the right of eminent domain may be invoked, and asserts the right of the state to regulate and control the sale, rental, and distribution of the same. (*People* v. *Stephens*, 62 Cal. 209; *McCrary* v. *Beaudry*, 67 Cal. 120.)

Nor do I see how the plaintiff's case is helped by section 374 of the Penal Code. I do not doubt the power of the legislature to make criminal the acts therein specified, when the direct effect of such acts is to pollute such waters. But there is nothing in the language of the section which makes it necessary to suppose that it was intended thereby to deprive riparian owners of property rights. It is not necessary to say that in the interest of public health the legislature cannot so restrict the rights of such owners as to materially interfere with the value of such rights. Such intent will not be presumed when the language leaves it doubtful.

The section, if it can be construed as limiting riparian rights at all, only has that effect as to certain riparian owners. In this case the defendant had expended, as it is found, ninety thousand dollars in his mill and other property connected with his business many years before water was taken from the stream for the supply of Eureka. The use it is making of the stream, as between itself and inferior riparian owners, may be a reasonable one. It was so found. After he had built his mill, and had been for years engaged in manufacturing lumber, the relator built its works, and, in defiance of law, which provides that it shall only supply the city with pure water, commenced taking the water from the stream, four and one-half miles below the mill, to sell to the inhabitants of Eureka. The water had been condemned by the board of health of the city of Eureka before it was taken by the relator. Apparently the relator is attempting through this proceeding to enable itself to perform its duty to sell pure fresh

water.  Instead of taking pure water, as the court found it could have done, it will make this stream pure by destroying the property of the defendant.  On the supposition made, the industry and the mode of conducting it were perfectly lawful before the relator constructed its works, and would have continued to be so but for the unlawful selection of this stream as the source from which relator would take its supply.

It is not the law nor the act of the defendant alone which constitutes the nuisance.  The selection of this stream by the relator renders the act unlawful which before was not.

Perhaps such a thing may be done when it is absolutely necessary.  The power of the legislature in this regard is very broad.  But I do not think the legislature can, under the undefined and undefinable power called the police power, take private property for public use without compensation when such property can be condemned and paid for.

I have called attention to the fact that the law is not uniform in its operation, not only because it does not afford the same protection to rural and urban populations, but because it authorizes private persons in charge of a public use to select certain riparian owners, and, if the construction contended for by appellant be correct, take without compensation, for the pecuniary advantage of private speculators, a valuable portion of their property.  Conceding that the plant of defendant and its mode of conducting its work is lawful and proper as against inferior riparian owners, the relator had no right under the law to take water for the purpose of selling it to the inhabitants of Eureka without first removing the causes of pollution.  This it could do, so far as defendant's mill is concerned, by condemning and paying for it.  It cannot in this proceeding, nor could the legislature in the exercise of the police power, authorize it to take the property without compensation.  As was said by the supreme court of Massachusetts: "The law will not allow rights of prop-

erty to be invaded under the guise of a police regulation for the preservation of the health, or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the legislation the courts will interfere to protect the rights of citizens." (*Watertown* v. *Mayo*, 109 Mass. 315; 12 Am. Rep. 694.)

If this law, therefore, has any force, as applied to this case, its sole effect must be to render criminal the specific acts mentioned in the statute. These were already unlawful, for they constitute nuisances. To declare them criminal is not to limit riparian rights.

The court found also that a considerable number of people reside upon the borders of the stream below the mill of defendant, who use the waters of said stream. They are inferior riparian owners, and the attorney general may present their grievances in this case.

The court found: " That during the greater part of the year defendant keeps in its dam large quantities of redwood, spruce, and pine logs. That a liquid containing some coloring matter is discharged by the redwood logs into the water, which to some extent discolors the water of said stream and gives it a darkish appearance, and in a slight degree this discoloration remains in the water to the intake of the Ricks Water Company; but the quantity of liquid that escapes from said logs is comparatively small, and it does not render the waters of said stream offensive or repulsive to the senses, or greatly discolor deteriorate, defile, or contaminate them, and it does not injure or essentially impair them for domestic and drinking purposes." Also that the logs are not covered with foul organic matter, or other substance which contaminates the water; that prior to the erection of defendant's dam the waters of Elk river had a darkish appearance, owing to the falling of leaves into the stream, to juices from the roots of trees and fallen timber, and the condition of the water now, in respect to color, is very much as it has been for many years back.

It was also found that sawdust is not put into the

stream nor allowed to decay on its banks so that water percolating through it discolors or pollutes the stream, that all necessary precautions are taken to prevent the sawdust from getting into the river, that the same is burned upon the banks, and that the little that unavoidably gets into the river does not materially affect or discolor the waters of the stream.

Upon the facts so found I do not think we can interfere with the decree in behalf of lower riparian owners. So far as they have appeared in the case, which is only as witnesses, they seem to be entirely satisfied with existing conditions. Apparently all—or nearly all—depend upon the lumbering industry for their means of subsistence, and most of them upon the business conducted by the defendant. It would be rather hard for them to have the industry suppressed by a proceeding in their behalf by the attorney general.

I must confess that, to my mind, whether the impounding of logs in the river and the consequent discoloration and pollution of the water is not a nuisance of which lower riparian owners may complain is a close question. But, under the circumstances of this case, I do not think the decree should be disturbed.

The judgment and order are affirmed.

HENSHAW, J., and McFARLAND, J., concurred.