### CITY OF LOS ANGELES v. BORAX CONSOLIDATED, Limited, et al.

No. Q–12–C.

District Court, S. D. California, Central Division.

June 24, 1937.

Loren A. Butts and John Beardsley, Deputy City Atty., both of Los Angeles, Cal., for plaintiff.

Newlin & Ashburn, of Los Angeles, Cal. (Allen Ashburn, of Los Angeles, Cal., of counsel), for defendant Borax Consolidated.

COSGRAVE, District Judge.

Action to quiet title to part of Mormon Island in the inner bay of San Pedro brought by the City of Los Angeles against the Pacific Coast Borax Company and another, after judgment in a former trial reversed on appeal. City of Los Angeles v. Borax Consolidated Limited (C.C.A.) 74 F.(2d) 901; Borax Consolidated v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9.

The plane of mean lower low water was first ascertained in 1878 and the position of its datum plane was preserved by bench mark 10.07. All other bench marks in the district are derived from and based upon this. The evidence shows that they all have remained constant with the exception of some slight disturbance about 1927. The plane of mean high water was established at about the same time at 5.1 feet above the datum of mean lower low water. The defendant has introduced evidence to show that, due to the restricted entrance to and shallow depth of the harbor, these two datum planes cannot be held applicable to Mormon Island at the date of the issuance of the patent in 1881. While such condition is reasonably possible, supported as it is by eminent authority, the actual records indicate the contrary, that is, that the two planes existed in 1881 as they do today, both at Mormon Island within the bay and at 10.07 at its entrance.

These elevations were accepted by the United States Coast and Geodetic Survey and all other government agencies until 1927 when the Coast and Geodetic Survey, believing that the element of seiche should be eliminated, reduced the datum plane of mean high water from 5.1, the value theretofore given, to 4.7, the corrected value.

The first question to be determined is which of the two elevations is to be taken as establishing the line of mean high tide agreeably to the opinion of the Circuit Court. City of Los Angeles v. Borax Consolidated, supra.

█ Both parties agree that the datum plane from which tide elevations are measured is that of mean lower low water. The plaintiff in the action contends that mean high tide in the Los Angeles Harbor is 5.1 feet above the datum plane of mean lower low water, while the defendant in the action contends that the true height is 4.7 feet above the same datum plane. The difference arises because of the presence in the Los Angeles Harbor of a phenomenon known as seiche. The regular tides in the harbor have smaller oscillations superimposed upon them, and even these have smaller fluctuations still that vary their height. Water movements superimposed upon the regular tides within the harbor produce an alternate rising and falling of the water surface averaging about one complete movement every 53 minutes, and are known as "seiche." Seiche is not peculiar to Los Angeles Harbor, but exists there to a greater degree generally than elsewhere. At San Diego the movement is extremely slight, if any. It is not of astronomic origin as are the tides themselves, but is caused by terrestrial forces such as changes in barometric depression, storms, and even earthquakes. This movement of water thus imposed upon both the advancing and receding tides alternately carries the surface of the water to a point higher than the general ocean level and, immediately following, drops it back below such level. The United States Coast and

Geodetic Survey for a long period of time, in fact up to about 1926, in registering the height of the tide included the extreme height, that is, the height that the water reached at the highest point of the seiche movement, disregarding the height at the recession of the seiche immediately thereafter. Similarly, in registering the lowest point reached by the receding tide, they registered that at the lowest point of the seiche movement. Due to further study and investigation, the Survey in 1926, deeming the extreme height a false quantity, decided to average the height of the tide as between the highest point reached in the seiche and the low point immediately preceding or following it. The method is graphically described on the Plaintiff's Exhibit 31, a marigram of the automatic tide recording device placed at the entrance to the harbor, where, on a scroll driven by clock work, the actual variations of the tide level are recorded on a much reduced scale. A continuous line is drawn through the inequalities produced by the seiche, and this is adopted by the Coast and Geodetic Survey as the true height of the tide. ·U. S. Coast and Geodetic Survey, special publication No. 135, Tidal Datum Planes, p. 30.

It seems to me that this practice of the Survey is the correct practice. The height of mean high water itself is ascertained by averaging the height of all the higher tides; which is doing on a large scale what the Survey now does on a smaller scale with respect to the seiche. While it is literally true that the height thus obtained is not the actual height attained by the tide, it is nevertheless true that the extreme height is temporary only and that at the end of a period being one-half of the 53-minute period of oscillation, it is at a considerably lower level, the variance being often times more than a foot. The plaintiff itself in recording the tidal values within the harbor averages or smooths out the minor fluctuations upon the seiche, referred to on this marigram and on others introduced in evidence as "saw teeth" and which seem always to exist and at times average some twenty to the hour.

The Los Angeles Harbor is the only harbor following the rule contended for by the plaintiff, that is, where the extreme limits rather than the average of seiche movement is adopted. The theory upon which the level of mean high water itself is ascertained, that is, the average height of all the high tides; the practice of the plaintiff itself in averaging the minor variations of the seiche movement; considerations of uniformity of practice by the Coast and Geodetic Survey—all suggest that the value of 4.7 adopted by the United States Coast and Geodetic Survey, for the level of mean high tide in Los Angeles Harbor, be taken as the correct value for the purposes of the present case.

Having reached a conclusion as to the correct height of the plane of mean high water, the next question to be determined is where this plane intersected the surface of Mormon Island in 1880, being the date of the survey on which the United States patent was issued.

Norway surveyed the island in 1880; his field notes are not in evidence. Bosche made the next survey in 1883; Turner in 1899, all before any change had been made in the surface of the island; and Fitzgerald in 1909 while some work was in progress. These surveys are in substantial agreement and show only a small part of the land that was included in the Norway survey to be more than 4.7 feet above the plane of mean lower low water. The correctness of these surveys is confirmed to a considerable extent by defendant's own investigations, which it made shortly before the trial of the action by means of pits and excavations designed to reveal the elevation of the original surface of the island. The location of the 4.7 level is fairly shown on the composite map, a summary of all the surveys, introduced by the plain·tiff.

That the original surface of the island has been sensibly lowered by the weight of buildings, levees, by dredging of adjacent channels or by earth movements I think is unlikely.

The foregoing conclusions, expressed with as much brevity as an intelligible explanation to counsel permits, are arrived at from a consideration of the extensive and complicated evidence in the case directed to the points mentioned. A different question is presented by the acts of the parties themselves.

The defendant pleads that the question at issue has heretofore been adjudged; pleads estoppel against the plaintiff; and that the boundary of the land in dispute has heretofore been agreed upon.

The War Department established harbor lines in the Los Angeles Harbor on July 29, 1908. In October following, the title to the tidelands being then in the state of California, the people of the State of California, upon the information of the Attorney General, began an action in the state court, numbered 64540, to quiet title in the people of the state to the land included in the United States patent to Banning issued in 1881, as bounded by the Norway survey, naming as defendants the patentee Hancock Banning and the Banning Company. The case was tried and submitted, but on January 3, 1911, the submission was set aide for some cause not appearing. The City of Los Angeles acquired title in May, 1911. 1911 Statutes of California, p. 1256.

Coincident with the filing of action 64540, another action was filed by the state against Banning to determine the rights of Banning under tide location 152, with other land, being land bounding the land in question on the east and south and which was held by the Banning interests under purchase from the state as tide land. This last-named suit was finally decided on December 20, 1913. People v. Banning Co., 166 Cal. 635, 138 P. 101. It established what was known as the split title, that is, it held the Banning interests to be the owner of the land included in tideland location 152, subject to a public easement for navigation and fishery. It may be observed here that the California State Supreme Court has since modified this view, holding that no title to tide lands as such can be conveyed by the state. Uncertainty existing as to effect of the decision mentioned, negotiations were carried on by the city on the one hand, it having become the party plaintiff in interest, and the Bannings on the other, looking to a settlement of the differences between them respecting tide land location 152. Banning refused to make any agreement unless action 64540, involving title to Mormon Island, was dismissed. In a letter dated July 15, 1916, written by the city attorney to counsel for the Bannings, the city attorney expressly declined to settle all issues between the two parties explaining that the utmost the city could do was to dismiss action 64540. He expressed the opinion that certain surveys showed Mormon Island to be tideland and that the law prohibited any agreement involving a conveyance or forfeiture of any interest of that character and suggested that the

Banning interests take a lease of the land. On September 30, 1916, however, the city attorney procured and had in his possession a dismissal of the suit in question, No. 64540. Although the issue had been tried in 1909, the city did not in 1916 believe that it had sufficient evidence to establish that the land was in fact tideland.

In his report of pending litigation made to the Board of Harbor Commissioners for the year ending June 30, 1917, the city attorney on July 9, 1917, advised the Board with reference to the action 64540 that the "question compromised in Banning agreement." The agreement referred to is dated July 24, 1917, and acknowledged by the parties a few days thereafter.

This agreement, after reciting that the legal title to tideland location 152 was in the Banning Company, the establishment of harbor lines by the War Department and by the city, the pendency of action 64540 to quiet title to the lands known as Mormon Island, and the existence of disputes respecting tideland location 152, declares that "in consideration of the covenants, recitations and agreements herein to be kept and performed by the respective parties hereto and of the mutual consideration and benefits to inure thereto," the parties agree, among other things:

That the city will enter a dismissal of action No. 64540.

That the Banning Company convey a portion of tideland location 152 to the city.

That the city lease the land so conveyed to Banning Company.

That the consideration for the conveyance by the Banning Company to the city of the lands in tideland location 152 *"is the grant by the city to the Banning Company of the lease * * * together with the respective terms, conditions and covenants in this agreement contained, inuring to or binding upon the parties hereto."*

The execution of the agreement was authorized by ordinance duly passed, which directed the dismissal of the suit "in the proper manner."

On August 6, 1917, there was filed with the clerk of the court a document entitled "Dismissal," signed by counsel for the respective parties, addressed to the clerk, saying: "You will enter the dismissal of the above entitled action without prejudice." Under the same date the minutes of the court read that: "On motion of counsel for

both parties present in court it is ordered that this cause be and the same is hereby dismissed without prejudice." And on the same date a written order was signed and filed to the effect that the parties, by their attorneys, "appearing in open court this day and it appearing that the order of dismissal of the above styled case, signed by the respective parties has been filed, and upon request and agreement of all parties to the said action,

"It is hereby ordered that the said case be and the same is hereby dismissed.

"Dated the 6th day of August, 1917.

"Lewis R. Works,

"Judge of the Superior Court."

The clerk entered, under the same date in his register of actions: "Upon order of attorneys for both parties this day filed the above entitled action is hereby dismissed and order of court filed."

The dismissal of actions is covered by C.C.P. § 581, which provides that an action may be dismissed:

1. By the plaintiff himself by written request to the clerk filed with the papers in the case.

2. By either party upon the written consent of the other.

The dismissals mentioned in subdivisions 1 and 2 hereof are made by entry in the clerk's register.

■ It seems plain that subdivisions 1 and 2 of section 581, C.C.P., have in mind a proceeding by one of the parties to the action. The proceedings here shown seem to be not of that character, for while a stipulation was filed by the parties and ordered entered in the clerk's minutes that the case be dismissed without prejudice, both parties went further and appeared before the court, not depending upon the stipulation or minute order, but jointly procured a written order of dismissal to be signed by the judge and filed. Some purpose must be attributed to such action. It can hardly be believed that after an effective dismissal under subdivision 2 of section 581, which effect is contended for by the plaintiff, the parties then secured an entirely superfluous order of court. The United States Supreme Court, referring to a statute of the state of Nevada in substance, if not in language identical with section 581, holds that such a dismissal is not one within any of the subdivisions of section 581. United States v. Parker, 120 U.S. 89, 7 S.Ct. 454, 30 L.Ed. 601. Plaintiff contends that the proceedings outlined bring the case within subdivision 2 of section 581, and that the dismissal was complete when the order was entered in the clerk's register. It may be suggested that the entry in the clerk's register may no more be attributed to the stipulation than to the order signed by the judge, and that the order of dismissal in the register is itself unqualified.

Unless the dismissal comes within the provisions of section 581, it seems under the decisions of the state courts of California to have the effect of a judgment upon the merits under C.C.P. § 582. Amestoy Estate Co. v. City of Los Angeles, 5 Cal. App. 273, 275, 90 P. 42; Merritt v. Campbell, 47 Cal. 542, 548; McCord v. Martin, 47 Cal.App. 717, 727, 191 P. 89; 15 Cal.Jur. 185, p. 130; 18 Corp.Jur. 1171.

It is true that the agreement of July 17, 1917, contains no express settlement of the matters in dispute in action No. 64540. In this respect defendant's claim of retraxit is not sustained by the decisions which hold that before a retraxit can be claimed some disposition must be made of the specific matter in dispute in the dismissed action. Haldeman v. United States, 91 U.S. 584, 23 L.Ed. 433. The California Code provisions, and the effect given them by the state courts, remove the present situation from the effect of such decisions. The agreement for dismissal was in writing and made upon what is presumed to be a consideration. Both parties appeared in open court and the actual judgment of dismissal is unqualified. Such situation, it seems to me, is a complete defense to a renewal of the suit, amounting to a retraxit.

■ In 1921 defendant Borax Company possessed an option for the purchase of Mormon Island from Banning. At that time it had three plants in the United States; one at Bayonne, N. J., one at Chicago and one at Alameda, Cal., and, desiring to secure a property in southern California with private frontage on tide water, became interested in a site in Los Angeles Harbor, obtaining an option on the property in dispute. Its representative consulted the Board of Harbor Commissioners in informal session concerning every aspect and advantage that might result from the purchase of the property during a period of several months; were advised by the city attorney in response to their inquiry that such private wharfage would be avail-

able in the event it purchased Mormon Island; in a word advising the defendant that Mormon Island was private property. While these inquiries were going on and before the defendant exercised its option, the city itself bought at a price of more than $250,000 a portion of the property from Banning included in the Norway survey. In May, 1923, defendant exercised its option and purchased the land in question here, paying therefor some $140,000. It proceeded forthwith under permit issued by the city authorities to erect its plant, expending something approaching one and one half millions of dollars. The property was regularly assessed, as privately owned property, taxes levied and paid. In 1928 the city sought and obtained from the defendant a right of way revocable at pleasure, across the property for a pipe line for the use of the Shell Oil Company, a tenant of the city, and again a few months thereafter secured an additional right of way for the laying of a telephone cable. In the agreement granting the right of way the property is referred to as the property of the defendant. Unquestionably, during the twelve years that intervened between the dismissal of the action described in 1917 and the commencement of the present suit in 1929, the city believed that title to the land in dispute in this action was held in private ownership pursuant to the Norway survey and United States patent. Defendant had no reason to think otherwise.

Plaintiff, combatting the claimed estoppel, cites authority to the effect that a municipal corporation is without power to make or suffer alienation of land charged with a public use either by lapse of time or acts amounting to estoppel; the principal case cited being City of San Diego v. Cuyamaca Water Co., 209 Cal. 105, 287 P. 475. There, as here, the right involved was "governmental" as distinguished from "proprietary." The decision, however, states the vital question to be "whether the facts of this particular case are such as to permit the application of this doctrine [estoppel] * * * is the problem." 209 Cal. 105, 137, 287 P. 475, 490. Further, the finding of the trial court is cited (209 Cal. 105, 148, 287 P. 475, 494) "it is not true that the plaintiff has been guilty of any carelessness or any culpable negligence resulting in the defendants, or any of them, being misled." The intimation plainly is

that were the facts sufficient to justify a judgment of estoppel the court might properly give it. To my mind the case does not establish the doctrine that the municipal corporation may not under any circumstances be estopped.

Dillon expresses the belief that this is the true doctrine: "It will perhaps be found, that cases sometimes arise of such a character that justice requires that an equitable estoppel shall be asserted even against the public, but if so, such cases will form a law unto themselves, and do not fall within the legal operation of limitation enactments. The author cannot assent to the doctrine that, as respects public rights, municipal corporations are impliedly within ordinary limitation statutes. It is unsafe to recognize such a principle. But there is no danger in recognizing the principle of an estoppel in pais as applicable to exceptional cases, since this leaves the courts to decide the question, not by the mere lapse of time, but upon all the circumstances of the case to hold the public estopped or not, as right and justice may require." Dillon on Municipal Corporations (5th Ed.) vol. 3, § 1194; City of Los Angeles v. Kaspare Cohn, 101 Cal. 373, 35 P. 1002.

In my view it would be highly inequitable now, the city being the actor demanding relief, to impose a forfeiture against the defendant of these valuable interests acquired by it with the co-operation, active encouragement, and affirmative assurances of the city. The facts shown establish an estoppel in favor of the defendant.

It might be suggested that some uncertainty seems to have existed as to whether the boundary was the line of the neap tides or the mean of all the high tides until the judgment on appeal in present case heretofore cited. Certainly the defendant might have assumed from the affirmative acts of the city and long period of acquiescence that the latter regarded the boundary as fixed on the lines of the Norway survey. Since a boundary may be agreed upon by implication as well as expressly, it seems to me that in view of all the facts shown the existence of an agreed boundary follows as a matter of law.

A discussion of the mass of authority cited and used during the arguments, once

entered upon, would be endless. The foregoing give my conclusions and the reasons therefor.

Judgment is awarded defendant. Counsel will propose findings and decree.