CITY OF STOCKTON, a Municipal Corporation, Plaintiff,

v.

MILES AND SONS, INC., a Nevada Corporation, et al., Defendants.

Civ. No. 7384.

United States District Court
N. D. California, N. D.

July 31, 1958.

Monroe N. Langdon, City Atty., and Jack D. Wickware, Deputy City Atty., Stockton, Cal., and Holloway Jones, Jack M. Howard and John P. Horgan, San Francisco, Cal., for plaintiff.

C. Ray Robinson, Merced, Cal., Eugene A. Mash, San Francisco, Cal., and William J. Adams, Merced, Cal., for defendant, Miles and Sons, Inc., a Nevada Corporation.

HALBERT, District Judge.

This is an action in eminent domain, brought by the plaintiff, City of Stockton, to condemn a portion of certain real property owned by defendant, for the purpose of constructing thereon a public improvement in the nature of a flood control facility. The action was commenced in the Superior Court of the State of California, in and for the County of San Joaquin, and subsequently was removed to this Court on the basis of diversity of citizenship, defendant corporation being a citizen of the State of Nevada. More than the jurisdictional amount being involved, the case is properly before this Court (28 U.S.C.A. § 1332).

Among the issues raised by the pleadings was the issue as to the respective rights, interests and ownerships of plaintiff and defendant in the property taken, plaintiff asserting that the property taken by it was an existing natural watercourse, and defendant asserting that such natural watercourse had been abandoned prior to the taking. Defendant moved, under Federal Rules of Civil Procedure, Rule 56(b), 28 U.S.C.A., for partial summary judgment on that point, which motion was denied.

Plaintiff then moved for severance of the issue of abandonment of the al-

leged watercourse, and of the issue as to what constitutes the larger parcel and remaining property of defendant for which damages may be claimed by reason of the severance of the portion being condemned. Defendant consented to the granting of this motion; the motion was granted; and the case went to trial on those severed issues in advance of trial of the issue of compensation. Such trial has been had and the case is now before the Court for its decision and determination.

Since the determination of this case must be predicated to a large extent on the factual background developed by the evidence adduced at the trial, a statement of the pertinent facts, as they have been determined by the Court, is not only desirable but necessary. Before discussing the issues of the case and the applicable law, a statement of the controlling facts, somewhat in detail, will first be undertaken.

### The Facts

For many years prior to 1913, waters of the Calaveras River watershed, including the Calaveras River and several minor streams, had drained into the Calaveras River east of the City of Stockton, and had flowed through the Calaveras River to the San Joaquin River. About 1860 a channel or ditch, known as Mormon Slough, was dug or deepened running from the Calaveras River at a point immediately downstream from the community of Bellota, to and through the City of Stockton, and ultimately into the San Joaquin River. This channel became the carrier of the major portion of the water of the Calaveras River watershed. In 1913 a project was completed which cut off the flow of water in the westerly portion of Mormon Slough, and from that time forward none of the natural flow of the Calaveras River watershed has entered the City of Stockton. This latter project Illinois by writ of error which was dewas and is a diverting canal and levee, running roughly parallel to the easterly city limits of the City of Stockton, and carrying the waters of Mormon Slough

northerly to return those waters to the Calaveras River, whence they continue westerly until discharging ultimately into the San Joaquin River. A continuation of the levee at the southerly terminus of the diverting canal serves as a dam across Mormon Slough. None of the waters carried by Mormon Slough have ever passed over or through this dam, and the dam has effectively served its intended purpose of diverting to the north, all the waters of Mormon Slough which have reached the same since its completion in 1913. Following the completion of this dam, the portion of the old slough which lay westerly of the dam, and which passed through the City of Stockton, came to be referred to and designated as Mormon Channel, as distinguished from Mormon Slough. This terminology was employed at the trial of these issues, and will be followed in this opinion.

Subsequent to the completion of the diverting canal, and prior to December 23, 1915, there was but one occasion on which water overflowed Mormon Slough east of the diverting canal, then, after flowing cross-country westerly past the diverting canal, found its way into Mormon Channel. This was prior to 1930, and prior to the construction of another flood control structure known as Hogan Dam. Hogan Dam, constructed by or financed by the City of Stockton, is situated in the mountains east of Stockton, and was designed to regulate the flow in the Calaveras River below the dam, allowing, generally speaking, only so much water to pass down the river as could be successfully carried by the river and by Mormon Slough. Hogan Dam was completed in 1930.

A second and separate watershed, identified at the trial as the Duck Creek and Littlejohn Creek watershed, lies immediately to the south of the Calaveras River watershed. There is no direct connection between this second watershed and Mormon Slough or Mormon Channel; however, testimony at the trial indicated that when the streams of the more southerly watershed became swol-

len with heavy rains, they occasionally overflowed, and it was stated that flood waters from this watershed had, on occasion, reached as far as Mormon Channel. Since at least 1951, the date of completion of certain flood control projects on Littlejohn and Duck Creeks, none of the flood waters of that watershed reached Mormon Channel until December 23, 1955.

From some time prior to 1930, and until December 23, 1955, the only water which reached Mormon Channel and passed through that channel to its outlet was certain local surface water—rain water, lawn waterings and the like—and intermittent flood waters from Duck Creek.

At least as far back as 1939, the City formulated tentative plans for the filling of Mormon Channel. These plans were given considerable local publicity. On more than one occasion representatives of the City appeared before Congressional Committees considering flood control appropriations, and stated that the City contemplated, as part of the benefits of certain flood control projects, the filling and reclaiming of Mormon Channel. These plans remained tentative, however, until at least 1951, when the Farmington Dam was completed, providing some measure of control over the flow of water in Duck Creek and Littlejohn Creek. After 1951 the City's plans for filling Mormon Channel crystallized. The City Engineer made a thorough engineering study of the maximum amount of local surface waters which could be anticipated, and he designed, and the City installed, a conduit or box culvert sufficient to carry this flow. After the filling of the channel was authorized by the United States Congress, the City took necessary steps to place earthen fills across the channel to replace bridges, which formerly traversed the area. Property owners along the channel began or continued to place fill material in the channel with the full knowledge and consent, and in some cases, at the request of the City. The City Engineer testified that he interfered with the placing of fill material in the channel on only two or three isolated instances—when the material was unsuitable for permanent fill. In 1952 or 1953 the City Engineer requested of a predecessor of defendant that he not complete the filling of his land—the property here in question—until the City completed the installation of its culvert, but informed the then owner of the land that when the culvert was completed he might continue and complete the filling operation. The City's own trucks and crews placed fill material in the channel at some places other than the street crossings. There is some indication that the City's street department crews and trucks actually helped fill in the property of this defendant.

By December of 1955, the character of the channel had been changed in substantial degree. East of the easterly city limits of Stockton, the County of San Joaquin had filled the channel to provide a road crossing at Diamond Street. Within the city limits, the Western Pacific Railroad had filled the channel to provide a crossing for its tracks. The defendant's predecessors in interest had filled the channel for an entire block where it passed through the property here in question. The City of Stockton had completed seven or more substantial fills, each consisting of many thousands of cubic feet of dirt, each about 80 feet wide at the bottom, and topped with an asphaltic surface of permanent appearance. None of the enumerated fills had any facility for allowing water to pass, except for the conduit or culvert installed by plaintiff.

The property owned by defendant, part of which is the subject of this action, covered an area of two city blocks. This property was used by defendant's predecessor as a trucking terminal. Passing through this tract was a city street, Aurora Street.

On December 23, 1955, an unprecedented flow of water in Mormon Slough resulted in the overflow of that watercourse, east of the diverting canal. At the same time, Duck Creek overflowed, and its flood waters worked their way

north. The flood waters escaping from these two watercourses mingled and made what might be described as an "end run" around the diverting dam, and found their way into Mormon Channel, within the city limits. All of the various fills referred to above were opened that night to allow the water to pass, except the filled area on defendant's land, and the Aurora Street fill, immediately upstream and contiguous to defendant's property. The workers were able to open only a "garden ditch" across Aurora Street. The water coursed over the banks of Mormon Channel, through defendant's shops and offices. Some of the water went over the banks to the south and flooded parts of the City. The conduit or culvert, meanwhile, carried its fully designed capacity of water. On the day following the flood, plaintiff entered onto defendant's property and opened up a new channel across it. Shortly thereafter the present action was commenced.

Having set in place the factual backdrop, I must next turn to the factual foreground, integrate it with the issues raised by the parties, and through the use of the applicable law, bring the entire legal picture thus created in proper perspective when viewed from any direction. As previously noted, there are two issues to be resolved. They are:

I. *Was the Mormon Channel abandoned?*

II. *What constitutes the larger parcel and remaining property of defendant for which severance damages may be claimed?*

These issues will be considered in the order that they are stated above.

## I.

From the facts already set forth in detail, it seems obvious that Mormon Channel was, at one time in the past, a watercourse. It is equally apparent that, except for the culvert constructed by the City, the former channel was completely blocked on December 23, 1955, and was not capable of carrying water. Until re-opened by the City on the night of December 23, 1955, it was not factually a watercourse. Whether it remained a watercourse in contemplation of law is the primary question before me.

The term "watercourse" is defined, generally, as a stream, having a definite channel, that is, having a bed and sides or banks, as well as a source of water. It is of the essence of a watercourse that it have a capacity to carry water (Los Angeles Cemetery Ass'n v. City of Los Angeles, 103 Cal. 461, 465, 37 P. 375; Smith v. City of Los Angeles, 66 Cal.App.2d 562, 153 P.2d 69; Cederburg v. Dutra, 3 Cal.App. 572, 86 P. 838; and Haun v. De Vaurs, 97 Cal.App.2d 841, 842, 218 P.2d 996). Again making exception for the City's culvert, it is immediately apparent that the property here being condemned lacked that essential element, and did not fulfill the factual or legal requisites of a watercourse. Plaintiff contends that a channel does not lose its character as a watercourse merely because it has been dammed or filled at a point upstream, where it still serves as a natural drain for rainfall and other surface water from adjacent lands (Smith v. City of Los Angeles, supra; and Cederburg v. Dutra, supra). Those cases, however, dealt not with the filled portion of the watercourse, but with the unfilled portion, which still exhibited a bed and banks, and a capacity to carry water. In Haun v. De Vaurs, supra, it was held, as in the Smith and Cederburg cases, that the lower portion of the channel, there involved, continued to exist as a watercourse despite the filling of a substantial portion upstream. The ruling was not applied, however, as to the filled portion of the channel. In the present instance we have not only the damming upstream, completely shutting off the historical flow of water, but also a filling of the property being condemned to the level of the surrounding land. As will appear more fully below, plaintiff had, prior to the filling of defendant's land, abandoned any rights, which it might theretofore have had, to keep the channel open, and, subject to the continuing right of plaintiff to maintain its

closed culvert, defendant was legally entitled to put its land to productive use by filling it in the manner in which it was filled.

Plaintiff contends that its municipal rights and duties in a natural watercourse cannot be abandoned or relinquished. As to its alleged rights, plaintiff relies on Weber v. Gill, 98 Cal. 462, 33 P. 330, a suit by an owner of land through which ran Mormon Slough, to enjoin the City from removing obstructions to the channel. That case, decided in 1893, was based on a far different factual situation from that which now faces me. At the time of the Weber decision, the full natural flow of the Calaveras River watershed was carried by the channel. Such is not now the case. Moreover, nothing in the Weber decision indicates that the right, then held to exist, could not be abandoned.

In line with the argument relative to municipal rights, plaintiff also contends that it, in its proprietary capacity as owner of property through which the channel runs, has a right to the perpetual maintenance of the channel in its natural state (Hellman Commercial Trust & Savings Bank v. Southern Pac. Co., 190 Cal. 626, 214 P. 46; Provident Irrigation Dist. v. Cecil, 126 Cal.App.2d 13, 271 P.2d 157; and Fell v. M. & T., Incorporated, 73 Cal.App.2d 692, 166 P.2d 642). Whatever may have been the law of California in the past, recent decisions have made it abundantly clear that many changes may lawfully be made with respect to watercourses or channels, including filling and abandonment, without liability therefor or hindrance therein (Bauer v. County of Ventura, 45 Cal.2d 276, 283, 289 P.2d 1; Callens v. County of Orange, 129 Cal.App.2d 255, 276 P. 2d 886; Turner v. Hopper, 83 Cal. App.2d 215, 220, 188 P.2d 257; and People ex rel. Dept. of Public Works v. Stowell, 139 Cal.App.2d 728, 732, 294 P.2d 474).

In the last cited case, the court quoted with approval, and upheld the following reasoning of the trial court:

" 'It may be true that at one time there was a natural water course through this area. It is true that natural water courses may be present and have been present in other parts of the State but by reason of progress they have been changed or eliminated entirely. In the instant case the cause for a natural water course has eliminated the necessity for maintaining it. When the reason for the application of the rule of law no longer exists, then the law has nothing on which to operate. The Court finds this to be true in the instant case. If this were not the law, the cities of San Francisco, Los Angeles and others would never have reached their present state of development because the people would have had to maintain natural water courses which no longer served any useful purpose.' " People ex rel. Dept. of Public Works v. Stowell, supra, 139 Cal.App.2d at page 732, 294 P.2d at page 447.

It is a well known fact, of which this Court may, and does, take judicial notice, that several of the major arterial streets in Stockton were once sloughs and watercourses, and have since been filled in and paved. The City of Stockton would have experienced great difficulty in achieving its present high state of development as a city if it had been legally impossible, as plaintiff now contends, for the natural watercourses and sloughs to be abandoned, filled and paved.

Plaintiff argues, however, that it cannot be held to have abandoned Mormon Channel as a watercourse because there was no formal action by the City to effect such abandonment. It was argued that abandonment can be effected only by following the procedure set forth in West's Ann. California Government Code, § 50430 et seq. This argument, however, runs afoul of the provisions of § 50431 of the same code, which latter section explicitly states that the procedure set forth in that Article is an alternative to any other "authority or pro-

cedure provided by law." Furthermore, under § 50437, the City Council is given an *election* to proceed under that Article. It would thus appear from the language of the statutory provisions themselves that the method of vacation of easements set forth therein is neither mandatory nor exclusive. The case of County of San Diego v. California Water & Tel. Co., 30 Cal.2d·817, 186 P.2d 124, 175 A.L.R. 747, holding that a county is bound by the exclusive statutory procedure set forth in §§ 954–960.4 of the West's Ann. Streets and Highways Code of California, when abandoning or vacating county roads, is not authority for plaintiff's contention that § 50430 et seq., of the West's Ann. California Government Code, provide an exclusive statutory procedure for the abandonment or vacation of a water drainage facility for the obvious reason that under §§ 954–960.4, of the West's Ann. California Streets and Highways Code, there is no room for an alternative method by which an abandonment of a roadway may take place.

■ The general common law rule, followed in California, is that mere non-user, neglect or failure to maintain an easement or right of way does not result in the abandonment of the easement where the easement was acquired by any method other than prescription. The nonuser must be accompanied by an intention on the part of the holder of the easement to abandon in order to constitute an abandonment (People v. Southern Pacific Co., 172 Cal. 692, 701, 158 P. 177; Furtado v. Taylor, 86 Cal.App.2d 346, 352, 194 P.2d 770; Strosnider v. Pomin, 52 Cal.App.2d 745, 750, 126 P.2d 915; and Watson v. Heger, 48 Cal.App. 2d 417, 420–421, 120 P.2d 153. But compare, Flanagan v. San Marcos Silk Co., 106 Cal.App.2d 458, 235 P.2d 107). And, generally, the intent to abandon is considered a fact question, and may either be express or implied (People v. Southern Pacific Co., supra; and Watson v. Heger, supra).

■ It should be noted, however, that where a governmental body, such as a municipal corporation, is the party charged with the abandonment, the intent to abandon must be shown by some official act, and not by mere implication (City of Vallejo v. Scally, 192 Cal. 175, 219 P. 63; City of Vallejo v. Burrill, 64 Cal.App. 399, 221 P. 676; Keller v. City of Oakland, 54 Cal.App. 169, 201 P. 618; and Humboldt County v. Van Duzer, 48 Cal.App. 640, 192 P. 192).

■ The crucial question is not whether the City Council passed a specific ordinance or resolution of abandonment of the channel, but whether the record shows official action by the City or an authorized body or person which indicated a clear intention by the City to abandon Mormon Channel as a watercourse. The record is replete with instances of such official action by the City (plaintiff) evidencing such intent. The City Council authorized, and appropriated the funds for, filling the channel at several places. The City Council adopted a budget providing money for the construction of the culvert heretofore mentioned. This latter action, standing alone, would be of lesser significance than it actually is, if it were not viewed in its context as merely the first step toward the completion of a capital improvement project contemplating the complete filling of the channel, which project in its entirety was presented to the Council as being number one on the priority list recommended by the Citizens Advisory Committee. The adoption of this budget item appears clearly to have been based upon the intention of the City Council, as soon as possible, to fill in the remainder of the channel. The City Council further passed resolutions authorizing the State to place soil from a construction job into the channel, and authorized the Mayor to contract with other parties for filling of portions of the channel. Actions by various City officials evidencing the City's (plaintiff's) intention abound in the record. The evidence is clear that the City (plaintiff) did intend to abandon and did, in fact, effectively abandon Mormon Channel as a natural watercourse.

■ Plaintiff argues further that the filling of defendant's land was unlawful, and could have been enjoined at any time as a nuisance, and that plaintiff was under a clear duty to prevent obstruction of the channel in order to protect the health and welfare of its citizens. I am not impressed with these arguments; they do not sit well on the shoulders of the plaintiff where plaintiff's own course of conduct has been, prior to the date of the taking herein, exactly opposite to the purport of the present arguments. The record points sharply to the conclusion that plaintiff raises these arguments solely for the purpose of attempting to devalue defendant's land in this condemnation action, and not in the hope of protecting the health, safety and welfare of its citizens. As to unlawfulness, plaintiff introduced certain ordinances, none of which appear to this Court to be controlling. One of the ordinances prohibited the throwing of solid matter into any public channel. This ordinance appears to refer to navigable channels, and, at any rate, does not appear to have been applied, or intended to be applied, by the City (plaintiff) to the property here in question. Moreover, the major part of the filling of defendant's land was completed after Mormon Channel had been effectively abandoned by plaintiff. Another ordinance discussed was one passed after the taking of the property here in question, prohibiting any further fillings of Mormon Channel. Not only does this latter ordinance fail by its own terms to apply to the filling of defendant's land, but if it were applied to the filling of defendant's land, it would constitute an arbitrary taking of property without due process of law (Griffin v. County of Marin, 157 Cal.App.2d 507, 321 P.2d 148).

■ Plaintiff contends that it has a duty to protect its citizens from the dangers of flood waters. Such a duty, if it were in issue here, might well be found to exist, and would tend to establish that the taking in this case is for a public use. But such duty has no further place in this action. The stated duty of pro-

tection presumably will be fulfilled by the construction of the storm drainage facility for which the subject property was taken. Where, as here, the defendant was legally entitled to fill and improve its land, the taking of defendant's land, for the construction of the storm drainage facility can be accomplished only under the power of eminent domain, not by a purported exercise of the police power (People ex rel. Ricks Water Co. v. Elk River Mill & Lumber Co., 107 Cal. 221, 227, 40 P. 531; and County of Plumas v. Wheeler, 149 Cal. 758, 762, 87 P. 909).

It is my considered conclusion on this first issue that prior to the taking of defendant's property herein, the plaintiff, City of Stockton, abandoned Mormon Channel as a watercourse or drainage facility, except for that certain box culvert or drain, approximately seven by ten feet in dimension, which was constructed by the City in or adjacent to the bed of the former channel.

■ Even if my conclusion were otherwise, I am constrained to note that defendant's property would not be subject to the burden of an open, wide canal passing through it. In those cases where a natural watercourse is found to exist, the burden of such a watercourse is no greater than that of accepting the water which comes to it by the natural flow of the stream or watercourse, and the surface waters which fall upon it and flow onto it from adjacent lands, and this burden is accompanied by the concomitant right to have such water flow onto the next adjoining land (Heier v. Krull, 160 Cal. 441, 117 P. 530). The land owner is entitled to make any reasonable and normal use of his land, including filling and leveling it, so long as adequate provision is made for the natural flow of drainage water, if any (People ex rel. Dept. of Public Works v. Stowell, supra; and Turner v. Hopper, supra). In the instant case, the evidence clearly shows that the only water which could be held to be a "natural flow" was the local surface waters, which the box culvert was designed to carry. The evidence indi-

cates, moreover, that the box culvert did carry the full capacity for which it was designed. There was no evidence that the local surface waters were any greater in quantity than had been contemplated by the City Engineer in designing the box culvert. The vast quantity of water, which caused such havoc in Stockton in December of 1955, was conclusively shown by the evidence to be flood water [and errant flood water at that], as to which defendant's land would owe no burden even if Mormon Channel were held to be a watercourse. Flood water is a "common enemy," against which one may protect his land even to the detriment of his neighbors (LeBrun v. Richards, 210 Cal. 308, 291 P. 825, 72 A.L.R. 336; Everett v. Davis, 18 Cal.2d 389, 393, 115 P.2d 821; and Clement v. State Reclamation Board, 35 Cal.2d 628, 220 P.2d 897). Moreover, the evidence indicates clearly that a good portion of the flood water here involved was from a watershed having no connection with Mormon Channel, even historically. The burden of service owed by land through which a natural watercourse runs is determined not by the fact that it is a natural watercourse, but by the factual conditions which measure the nature and extent of the servitude. Here, even if I were to find that Mormon Channel was an existing watercourse at the time of the taking, the burden on the land would be no greater or different than the continued maintenance of the culvert, or of a comparable facility, capable of carrying off the natural flow of drainage water.

Defendant's counsel moved at the trial for leave to amend its answer to state a defense based upon equitable estoppel of the plaintiff to deny the fact of its abandonment of the channel. In their respective memoranda submitted to me, plaintiff and defendant argued this point, but in light of the conclusion, which I have reached above, a decision on this point is not now necessary. I would note, however, in passing, that this Court is in agreement with defendant's argument that in proper cases a municipality

is subject to the rules of equitable estoppel (City of Los Angeles v. County of Los Angeles, 9 Cal.2d 624, 72 P.2d 138, 113 A.L.R. 370; and Times-Mirror Co. v. Superior Court, 3 Cal.2d 309, 44 P.2d 547). I feel, moreover, that if a decision on that point had been necessary, I would have been duty bound to hold that this is a proper case for application of estoppel as against a municipality, and, accordingly, I would follow the decision in City of Los Angeles v. Borax Consolidated, D.C., 20 F.Supp. 69, affirmed 9 Cir., 102 F.2d 52. In this last mentioned case, it was held that a city was estopped to claim realty as tidelands, when such city had treated the occupant of said realty on an island as the owner thereof, and under such circumstances, the occupant had acquired valuable interests with the city's cooperation, encouragement and affirmative assurances.

In the present case the consistent course of official acts and conduct of public officials relative to abandonment of the channel, particularly coupled with the representations of the City Engineer's office that defendant's predecessors were authorized to complete the filling of the subject property as soon as the City completed construction of its culvert (all of which constituted substantial and material representations, fully known to and relied upon by defendant's predecessors and their agents and officers) would amply support an estoppel even against a municipality, if they had not further convinced the Court that the abandonment of the channel was in fact effected.

## II.

The remaining issue to be determined is what constitutes the larger parcel and remaining property of defendant for which damages may be claimed by reason of the severance of the portion being condemned. Defendant's property, on which was maintained a motor transport service terminal, consisted of two city blocks, Block 43½ South of Mormon Channel, and Block 289 East of Center Street. Passing through defendant's property was Aurora Street, which the

evidence indicates is owned in fee by plaintiff. In the operation of defendant's property as a motor transport service terminal, full and free access from and to Aurora Street was at all times enjoyed by the operators of the terminal. There is no indication in the evidence, or in the memoranda submitted by the parties, that defendant or its predecessors were ever hindered or prevented in any way from passing trucks back and forth across Aurora Street. Plaintiff stipulated without reservation that all of defendant's property was devoted to a unified use.

The parcel taken in the present action constitutes all of Block 43½ except for a small portion in the northeast corner of that block. Plaintiff contends that the small corner of Block 43½ is the only portion of defendant's land as to which severance damages may be allowed. Defendant maintains that severance damages may properly be awarded for all of its remaining property, that is, Block 289, as well as the small corner of Block 43½.

In support of its proposition, plaintiff argues that strict physical contiguity is an absolutely essential factor in determining what constitutes the larger parcel, and that unity of use is not the controlling test. Plaintiff relies largely on the decision in City of Oakland v. Pacific Coast Lumber & Mill Co., 171 Cal. 392, 153 P. 705, and also cites People v. Ocean Shore Railroad, 32 Cal.2d 406, 196 P.2d 570, 6 A.L.R.2d 1179; City of Stockton v. Ellingwood, 96 Cal.App. 708, 275 P. 228; East Bay Municipal Utility Dist. v. Kieffer, 99 Cal.App. 240, 278 P. 476, 279 P. 178; City of Stockton v. Marengo, 137 Cal.App. 760, 31 P.2d 467; San Benito County v. Copper Mountain Min. Co., 7 Cal.App.2d 82, 45 P.2d 428; Atchison, T. & S. F. Railway Co. v. Southern Pac. Co., 13 Cal.App.2d 505, 57 P.2d 575; and County of San Mateo v. Christen, 22 Cal.App.2d 375, 71 P.2d 88.

Defendant maintains that the California Supreme Court, by its decision in People By and Through Dept. of Public Works v. Thompson, 43 Cal.2d 13, 271 P.2d 507, rejected the strict rule of contiguity and declared unity of use to be the controlling factor in determining this question. Defendant also points to persuasive language in People v. Ocean Shore Railroad, supra, and in People ex rel. Dept. of Public Works v. Russell, 48 Cal.2d 189, 309 P.2d 10. In the latter case, it was held that for purposes of determining severance damages it is immaterial whether the defendant owns the underlying fee in a road or has only an easement therein by reason of his ownership of abutting property.

If this question were to be decided by Federal law, there would be little reason to devote any substantial discussion to the problem. Under Federal law, it seems well established that unity of use is the controlling factor (Baetjer v. United States, 1 Cir., 143 F. 2d 391; and United States v. Waymire, 10 Cir., 202 F.2d 550). Plaintiff points, however, to the familiar rule that where Federal jurisdiction is based solely upon diversity of citizenship, the court is required to apply the substantive law of the state in which it sits (See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188). Plaintiff asserts further that the function of the Federal Court is not to change or extend state law, but only to ascertain and apply it (Skaug v. Sheehy, 9 Cir., 157 F. 2d 714; and City of Newark v. United States, D.C., 149 F.Supp. 917, 922).

It is undoubtedly true that I am obliged to apply the law of the State of California in determining this question but, as stated in City of Newark v. United States, supra, "* * * that does not mean that a State decision must be expressly overruled before this Court can consider it to have been discarded as a correct expression of State law." It is state law which must be applied, but it must be applied to the particular facts of the case before the court. The mere fact that a given factual situation has not previously been clearly presented to the California courts does not render this Court powerless to ascertain the applicable California law

and apply it to the specific facts before the Court.

It is significant that the California Supreme Court in City of Oakland v. Pacific Coast Lumber & Mill Co., 171 Cal. 392, 153 P. 705, decided that unity of use was *not* the controlling factor, but that absolute physical contiguity was required. In People By and Through Dept. of Public Works v. Thompson, 43 Cal.2d 13, 271 P.2d 507, decided some 38 years later, it was held that unity of use, and not contiguity, is the controlling factor. In the latter case, the court, at page 23 of 43 Cal.2d, at page 512 of 271 P.2d quoted with approval the language of 18 Am.Jur. 910–911, § 270:

"  *   *   *   When the property is actually used and occupied, unity of use is the principal test and  *   *   * it is not considered a separate and independent parcel merely because it was  *   *   * separated by an imaginary line, or  *   *   * by a highway  *   *   *".

In People v. Ocean Shore Railroad, supra, the California Supreme Court denied severance damages for non-contiguous property, but, in so doing, pointed out that there was in that case merely a *prospective* or *possible* unity of use, and that the property there involved, unlike the property in the instant case, was not then devoted to a unified use. The court recognized that contiguity is ordinarily an element in determining whether a parcel is separate and independent, but stated, 32 Cal.2d at page 423, 196 P.2d at page 581, that severance damages may properly be awarded " *   *   * where the property, though not physically contiguous, is being devoted to an existing unity of use."

In the Thompson case, supra, the showing of unified use was considerably weaker than in the present case. The defendant in the Thompson case owned three parcels of land, two of which were on the landward side of a highway, the third on the seaward side. One of the three parcels was farmed; the second was undeveloped marsh; and the third an undeveloped beach. This constituted more a nondiversity of use rather than a positive unity of use. Nevertheless, the court held that unity of use was controlling, and that since defendant had unlimited access back and forth across the highway, the highway was not factually a true or complete separation. It was further determined in the Thompson case that the defendant in that case owned the underlying fee in the highway which crossed his land, and that the state owned only an easement or right of way in the surface of the highway. This factor may have had some cumulative bearing on the court's decision, particularly where the showing of unity of use was, as compared to the instant case, quite weak. But the rationale of the Thompson case clearly was that the separation of the tracts by the highway did not render them separate and independent parcels where there was an existing unity of use and an actual means of access between the tracts. The reasoning of the Thompson opinion makes it clear that, even though the state owned but an easement in the surface, if there had been no actual lawfully used means of access between the tracts, then the award of severance damages would have been limited to the smaller parcel. Thus, access and unity of use clearly were the controlling factors. This view finds ample support in the authorities. The law, generally speaking, is that where there is actual and existing unity of use and purpose, the separation of the tracts in question by intangible lines, by watercourses of whatever nature, canals, railroads, highways and the like, is without legal consequence so long as there is an actual lawfully used means of access between the tracts (4 Nichols, Eminent Domain, § 14.31. See, also, 18 Am.Jur. 910–911, § 270, quoted in People By and Through Dept. of Public Works v. Thompson, supra, 43 Cal.2d at page 23, 271 P.2d at page 512).

It is my conclusion that the larger parcel and remaining property of defendant, for which severance damages may be awarded, consists of all of Block 289 East of Center Street, and the untaken

portion of Block 43½ South of Mormon Channel. In so deciding, I am not changing or extending, or attempting to change or extend, the law of California, but instead, I am applying that law as I have ascertained it to be from the latest pronouncements of that state's highest court, to the factual situation disclosed by the evidence before me in this case.

Let the necessary order be entered in accordance with this opinion. Defendant will prepare findings, conclusions and all other necessary documents required in connection with this order, and lodge them with the Clerk in accordance with the applicable law and the rules of this Court.